UTAH WOMEN'S CLINIC, INC., Edward R. Watson, M.D., Madhuri Shah, M.D., Laurel Shepherd, M.D., Alissa Porter, Wendy Edwards, Wasatch Women's Center, P.C., William R. Adams, M.D., Denise Defa, and Sarah Roe, Plaintiffs,

v.

Michael LEAVITT, in his individual and official capacity as Governor of the State of Utah, and Jan Graham, in her individual and official capacity as Attorney General of the State of Utah, Defendants.

No. 93C407B.

United States District Court,
D. Utah C.D.

Feb. 1, 1994.

Eve C. Gartner, Lenora M. Lapidus, Janet Benshoof, New York City, Martin W. Custen, Ogden, UT, for plaintiffs.

Linda Luinstra–Baldwin, Brent A. Burnett, Reed M. Stringham, Mark Ward, Salt Lake City, UT, for defendants.

## OPINION and ORDER

BENSON, District Judge.

On January 28, 1994, a hearing was held before the Honorable Dee Benson. The court heard oral argument on plaintiffs' Objections to the Report and Recommendation of the Magistrate Judge. The plaintiffs were represented by Eve Gartner and Lenora Lapidus, of the Center for Reproductive Law & Policy, New York City, New York, and Martin W. Custen, of Marquardt, Hasenyager & Custen, Ogden, Utah. The defendants were represented by J. Mark Ward, of the office of the Utah Attorney General. The court, having reviewed the memoranda submitted by the parties, having heard oral argument from counsel, being fully apprised, and for good cause appearing, hereby enters the following Opinion and Order:

## INTRODUCTION

A brief history of recent legal developments on the subject of abortion follows:

(1) In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the United States Supreme Court held that women in the United States have a constitutional right to have an abortion, with certain specified conditions. This decision had the immediate effect of striking down many state laws against abortion, including Utah's. *See Doe v. Rampton*, 366 F.Supp. 189 (D.Utah 1973).

(2) In the 21 years since *Roe v. Wade*, the political battle over abortion has intensified, no doubt affecting decisions of voters, legislators and, to some extent, presidential appointments to the United States

Supreme Court. There are unquestionably large groups of Americans on both sides of the abortion debate, at one extreme urging the reversal of *Roe* and at the other extreme seeking to preserve and even strengthen the case as a matter of constitutional right.

(3) In the past 21 years, states have on occasion passed statutes attempting to put certain restrictions and controls on abortion. Many of these laws have been challenged in federal court as unconstitutional. Because of *Roe,* most of the state legislative attempts to place restrictions on abortion, no matter how minor, were found by the courts to be unconstitutional. *See, e.g., Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). In cases subsequent to *Roe,* the United States Supreme Court required "any regulation touching upon the abortion decision" to "survive strict scrutiny, to be sustained only if drawn in narrow terms to further a compelling state interest." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* — U.S. —, —, 112 S.Ct. 2791, 2817, 120 L.Ed.2d 674 (1992).

(4) In 1989, the United States Supreme Court signaled a change in the test for state law restrictions on abortion in *Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). There, in assessing the constitutionality of a Missouri abortion statute, the Supreme Court applied a more deferential standard of review. In upholding the constitutionality of the Missouri statute, the Court noted: "There is no doubt that our holding today will allow some governmental regulation of abortion that would have been prohibited under the language of [earlier Supreme Court cases]." *Id.* at 520–21, 109 S.Ct. at 3057–58.

(5) The Supreme Court's opinion in *Webster* created a great deal of interest in the legal and political battle over abortion. Many commentators predicted that *Webster* foreshadowed the reversal of *Roe v. Wade. See, e.g., Thornburgh Predicts Roe v. Wade Reversal,* N.Y. Times, July 10, 1989, at B8; Bruce Fein, *The Court is Ready to Overturn 'Roe',* N.Y. Times, July 5, 1989, at A21; Al Kamen, *Supreme Court Restricts Right to Abortion, Giving States Wide Latitude for Regulation,* Wash. Post, July 4, 1989, at A1. *Webster* appeared to open up new opportunities for states to exert an interest in protecting unborn life by imposing additional restrictions on abortion. In response to this opinion, several states passed new legislation further protecting the life of the unborn fetus, and restricting the woman's right to an abortion. *See, e.g.,* 1989 Pa.Laws 592, No. 64; 1990 Guam Pub.Law 20–134; 1991 La. Acts 26.

(6) In 1990, the Utah legislature adopted a resolution stating that the policy of the legislature was to favor childbirth over abortion and to restrict abortion to the extent the Constitution would permit. HJR 39, Abortion Limitation Resolution. The following year, in 1991, the legislature enacted Senate Bill 23, An Act Relating to Abortion; Prohibiting Abortion Except Under Special Circumstances (the "1991 law"). This law essentially banned abortions in Utah unless one of several exceptions was met.[1]

(7) The 1991 Utah law was clearly in conflict with *Roe v. Wade.* It was passed with the hope that *Roe* would be overturned. The Governor publicly stated that the law would not be enforced until its

---

**1.** The law allowed for abortions where the pregnancy was the result of rape or incest, and where the abortion was necessary to save the pregnant woman's life, to prevent grave damage to her medical health, or to prevent the birth of a child who would be born with grave defects. The rape and incest exceptions did not apply after the pregnancy had reached 21 weeks gestational age. *See* Utah Code Ann. § 76–7–302(2).

The statute also included a requirement of spousal notification, and set up a statutory presumption of viability at 21 weeks gestational age. *Id.*

constitutionality had been determined by the courts. The state did not hide the fact that the law was passed in anticipation of the reversal of *Roe v. Wade.*

(8) That did not occur. In 1992, the United States Supreme Court decided *Planned Parenthood of Southeastern Pennsylvania v. Casey,* — U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), which reaffirmed *Roe v. Wade.*[2] Consequently, as expected, Utah's 1991 law was declared unconstitutional, with no objection to that general finding by the state of Utah. *See Jane L. v. Bangerter,* 809 F.Supp. 865, 870 (D.Utah 1992) (*"Jane L. III"*). There was, however, extended litigation in this federal court (Judge J. Thomas Greene presiding) over numerous challenges to the 1991 law.[3]

(9) In *Casey,* the United States Supreme Court reviewed the constitutionality of a Pennsylvania abortion law. The principal elements of the Pennsylvania law were: 1) a 24–hour waiting period, 2) informed consent based on the mandatory distribution of certain information to every woman seeking an abortion in Pennsylvania, and 3) a requirement that the spouse of the pregnant woman be notified of the abortion. The law also included medical

emergency exceptions from these requirements.

(10) The Supreme Court in *Casey* upheld the essence of *Roe,* but it modified the standard for evaluating state restrictions on abortion. The Court determined that in asserting an interest in protecting fetal life, a state may place some restrictions on pre-viability abortions, so long as those restrictions do not impose an "undue burden" on the woman's right to an abortion. The Court explained that a state regulation imposes an undue burden if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey,* — U.S. at ——, 112 S.Ct. at 2820.

(11) In applying this standard to the Pennsylvania law, the United States Supreme Court determined that the 24–hour waiting period, the informed consent requirement, and the medical emergency definitions did not unduly burden the right to an abortion and were therefore constitutional.[4] *Casey,* — U.S. at —— – ——, 112 S.Ct. at 2822–26.

(12) In 1993, the Utah legislature tried again. The Utah Abortion Act Revision, Senate Bill 60 ("S.B. 60") (codified at Utah Code Ann. § 76–7–305), was enacted. Rather than anticipating what the United

**2.** The Supreme Court explained that "the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child," *Casey,* — U.S. at ——, 112 S.Ct. at 2804, but that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Id.*

**3.** Only a portion of the 1991 law was found to be unconstitutional. The court struck down the law's restriction on pre-viability abortions and its spousal notification requirement. On the other hand, the court upheld the statute's presumption of viability at 21 weeks and its restrictions on abortion after that time. *Jane L. III,* 809 F.Supp. at 871–74. The court also upheld the statute's medical health provisions, *id.* at 874–76, 877–80, and its fetal experimentation provision. *Jane L. v. Bangerter,* 794 F.Supp. 1537, 1549–51 (D.Utah 1992) (*"Jane L. II"*).

The majority of plaintiffs' challenges were dismissed by the court. Plaintiffs had alleged that the 1991 law violated the United States Constitu-

tion under the following theories: (a) Vagueness, (b) Equal protection, (c) Establishment of Religion (d) Free Exercise (e) Involuntary Servitude, and (f) Free Speech. Each of these theories was also raised under the Utah constitution. The court found no merit to any of these challenges and dismissed them all. *See Jane L. v. Bangerter,* 794 F.Supp. 1528 (D.Utah 1992) (*"Jane L. I"*); and *Jane L. II,* 794 F.Supp. at 1537.

The court later determined that several of these claims were frivolous, and awarded attorney's fees to defendants on those grounds. *See Jane L. v. Bangerter,* 828 F.Supp. 1544 (D.Utah 1993) (*"Jane L. IV"*). Specifically, the court made findings that plaintiffs' claims were "frivolous and groundless," *id.* at 1554–55 (involuntary servitude claim), "without foundation," *id.* at 1555 (equal protection claim), "frivolous, and without legal or factual foundation," *id.* at 1556 (establishment clause claim), and "brought in bad faith," *id.* (state constitutional claims).

**4.** The Court found, on the other hand, that the spousal notification requirement placed a substantial obstacle on the abortion right and was therefore unconstitutional. *Casey,* — U.S. at —— – ——, 112 S.Ct. at 2826–31.

States Supreme Court might do in the future, as had been the case in enacting the 1991 law, the legislature closely tailored S.B. 60 to those portions of the Pennsylvania law which had already passed constitutional muster in *Casey*. S.B. 60 provides for informed consent by requiring that certain information be given to the pregnant woman at least 24 hours prior to the performance of the abortion. The law allows for exceptions to this requirement in the event of a medical emergency.

(13) The Utah and Pennsylvania laws are nearly identical. *Compare* Utah Code Ann. § 76–7–305 with 18 Pa.Cons.Stat. Ann. § 3205 (1990). In those instances where the laws differ, the Utah law is less restrictive, and places less of a burden on a woman's right to an abortion.[5]

(14) Notwithstanding the fact that S.B. 60 was modeled after the constitutionally sufficient Pennsylvania law, plaintiffs initiated this litigation by filing a *106* page Complaint, which could more properly be described as a press release, challenging the constitutionality of the new Utah law. Plaintiffs' counsel boldly asserted that in this case *Planned Parenthood v. Casey* is not controlling, and that they can prove it.

(15) It is and they haven't.

### DISCUSSION

*Procedural Background*

S.B. 60 was scheduled to take effect on May 3, 1993. On April 23, 1993, however, plaintiffs initiated this litigation, seeking preliminary and permanent injunctive relief to stay enforcement of the law. This court granted a 10–day Temporary Restraining Order staying enforcement of the Act. After the stay was extended for an additional 10 days, the parties entered into a stipulation to continue the stay pending the court's resolution of plaintiffs' motion for injunctive relief. (dkt. 37)

The case was referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(B). Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, and as agreed by the parties, the trial on the merits of this case was advanced and consolidated with the hearing on the motion for preliminary injunction.

The consolidated hearing for injunctive relief was held before the Magistrate Judge on June 21, 1993. Pursuant to an agreement of the parties, the following three issues were presented to the court at the hearing:

1. The constitutionality of the Utah 24–hour waiting period for an elective abortion.[6]

2. The constitutionality of the Utah medical emergency exceptions to the waiting period for an elective abortion.

3. The constitutionality of the Utah abortion statute's requirement that certain information be provided to every woman who seeks an elective abortion.

(dkt. 36)

On November 10, 1993, the Magistrate Judge issued his Report and Recommendation. The Magistrate Judge determined that the 24 hour waiting period and the information requirement do not impose an undue burden on the right to an abortion. He further determined that the medical emergency provisions provide a constitutionally workable health exception and are not unconstitutionally vague. Finding that S.B. 60 is constitutionally proper, the Magistrate Judge therefore recommends that plaintiffs' request for injunctive relief be denied, that the current stay be lifted, and that plaintiffs' case be dismissed. *See Report & Recommendation,* at 121.

### PLAINTIFFS' OBJECTIONS TO THE REPORT AND RECOMMENDATION

Ironically, the bulk of plaintiffs' "objection" memorandum is spent urging this court to

---

5. For example, the laws differ as to the question of who must provide the initial medical information 24 hours prior to the abortion. The Pennsylvania law requires that a physician shall provide such information. *See* 18 Pa.Cons.Stat.Ann. § 3205(a)(1) (1990). Under the Utah law, the initial information may be given by various non-physician medical practitioners, so long as the attending physician gives the information prior

to performing the abortion. *See* Utah Code Ann. § 76–7–305(1).

6. The term "elective abortion" refers to an abortion based on the choice of a woman as opposed to a spontaneous abortion. *See Report & Recommendation,* at 5 n. 2.

adopt the analysis of the Magistrate Judge. Plaintiffs ask the court to accept and adopt the Report and Recommendation's findings as to the first two issues—the 24 hour waiting period and informed consent requirement. Plaintiffs object to only one of the issues determined by the Magistrate Judge—the medical emergency exceptions.

## I. THE WAITING PERIOD/INFORMED CONSENT REQUIREMENTS

Plaintiffs submit that they do not object to the Report and Recommendation's conclusions as to these issues so long as the court does not reject or modify the Magistrate Judge's interpretation and analysis. Specifically, plaintiffs condition their acceptance of the Report and Recommendation on the court's adoption of: "(1) the R & R's construction of the statutory term 'orally inform'; [and] (2) the R & R's conclusion that a physician could only be subjected to prosecution if he or she acted with bad faith with the intent to violate the statute. . . ." *Plaintiffs' Objections to the Magistrate Judge's Report and Recommendation,* at 6 (*"Plaintiffs' Objections"*).[7]

Plaintiffs' concerns and positions on these issues are procedurally and legally improper. They do not constitute allowable objections to the Report and Recommendation. As will be explained in more detail below, plaintiffs' so-called conditional non-objections are irrelevant to the constitutional issues presented by their Complaint, and they are therefore summarily rejected by the court. On the issues related to the 24 hour waiting period and informed consent requirements, the court accepts the Recommendation of the Magistrate Judge.

### A. Telephonic Communication Not Required Under Casey.

■ In evaluating S.B. 60, the Magistrate Judge interpreted the term "orally inform" to allow for telephonic communication, rather than requiring a face-to-face meeting. Plaintiffs submit that they do not object to the Report and Recommendation if this court will adopt that interpretation. Such an interpretation, however, is not necessary to uphold the constitutionality of the law under *Casey.*

The district court in *Casey* made a specific finding, on the record, that the Pennsylvania law would require a minimum of *two* visits for *every* woman. *See Planned Parenthood of Southeastern Pennsylvania v. Casey,* 744 F.Supp. 1323, 1351 (E.D.Pa.1990) (*"Casey I"*). Nevertheless, the United States Supreme Court, based on that record, upheld the Pennsylvania law as not unduly burdensome. *Casey,* —— U.S. at ——, 112 S.Ct. at 2825–26.

Because the two visit requirement is constitutional in Pennsylvania, it must also be constitutional in Utah—especially in the context of a facial challenge. Accordingly, even if S.B. 60 were to specifically mandate two visits to the abortion clinic for every woman, it could not be found facially unconstitutional

---

**7.** Plaintiffs also condition their acceptance of the Report and Recommendation on the court's accepting their position on the issue of civil liability of physicians under the Act. Plaintiffs submit that this court "must . . . clarify that compliance with S.B. 60 would insulate physicians in any civil malpractice action premised on a failure to obtain informed consent." *Plaintiffs' Objections,* at 6–7. To this end, plaintiffs have submitted additional evidence as to potential civil liability of abortion practitioners.

Plaintiffs' demand for clarification on this matter is not proper. It is completely irrelevant to the issues at hand. The constitutionality of S.B. 60's informed consent requirement is not dependent upon the issue of civil liability for abortion practitioners. It is illogical and improper to condition the lack of an objection to one issue on the court's willingness to provide a favorable interpretation of a different, unrelated issue.

Furthermore, the issue of civil liability for abortion practitioners who comply with the act is not a part of this lawsuit. It was not raised in the plaintiffs' Complaint. It was not one of the issues presented to the court at the consolidated hearing. It was not discussed in the Report and Recommendation of the Magistrate Judge.

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, plaintiffs must raise specific objections to the portions of the Report and Recommendation with which they disagree. They may not raise new issues which were not raised before the Magistrate Judge. Moreover, there are serious questions as to whether plaintiffs have standing to bring such a claim.

Accordingly, the court declines to clarify any aspect of physician civil liability under the abortion law.

on those grounds. An informed consent requirement which requires two visits is simply not a substantial obstacle, as stated by the Supreme Court in *Casey*.

Plaintiffs' efforts to require more of the Utah statute in order for the statute to survive a constitutional challenge are clearly without merit and constitute an attempt to improperly use the court's resources to ·obtain an advisory opinion, which is certainly not a proper purpose under a facial challenge.

### B. Facial Challenges in the Abortion Context.

Plaintiffs' approach suggests that once it appeared from the Magistrate Judge's virtually unassailable Report and Recommendation that no finding of unconstitutionality was possible, the plaintiffs' tactic became one of obtaining a favorable advisory opinion as to how S.B. 60 should be interpreted and enforced, rather than a good faith facial challenge to its constitutionality.

Plaintiffs' motive in that respect is shown by statements made in their memorandum. ·First, plaintiffs state that, "[h]ad the Attorney General clarified [the issue of face-to-face communication], this entire lawsuit might have been avoided." *Plaintiffs' Objections*, at 4 n. 3. Second, although the Magistrate Judge recommended that plaintiffs' facial challenge be denied, plaintiffs readily conceded that the Magistrate Judge was correct and did not object to his recommendation so long as the court adopts certain interpretations in the Report.

■■■ Plaintiffs' approach reveals a misuse or misunderstanding of the facial challenge. Facial challenges carry a high standard of proof. Traditionally, facial challenges are governed by *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). There, the Court explained:

> A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.

A facial challenge must challenge the language rather than the application and enforcement of a statute. A good faith facial challenge may not be brought unless the plaintiff believes that the statute is invalid as written, and that there is no way in which the statute can be applied in a constitutional manner.

■■■ When interpreting statutory provisions in the context of a facial challenge, "courts should construe a statute to avoid a danger of unconstitutionality." *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 512, 110 S.Ct. 2972, 2980, 111 L.Ed.2d 405 (1990) (quoting *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 493, 103 S.Ct. 2517, 2526, 76 L.Ed.2d 733 (1983)). Courts should not strike down a statute "based upon a worst-case scenario that may never occur." *Id.* 497 U.S. at 514, 110 S.Ct. at 2981. Courts should not engage in speculation as to how a statute might be enforced. When a statute is capable of a plausible interpretation which would render it constitutional, that interpretation must be accepted and the statute must survive the facial challenge, even if there are other, equally plausible interpretations which would render the statute unconstitutional.

■■■ In *Casey*, the Supreme Court seems to have altered the traditional standard for facial challenges in the abortion context.[8]

---

8. In *Casey*, the Court struck down the Pennsylvania spousal notice provision, not because it was unconstitutional in all circumstances, but rather because it was unconstitutional "in a· large fraction of the cases in which [it] is relevant." *Casey*, at ——, 112 S.Ct. at 2830.

This language, by itself, leaves little guidance as to whether, and how, the *Salerno* facial challenge analysis has been altered. The issue remains a matter of dispute among the members of the Supreme Court. In 1992, Justices Scalia, Rehnquist, and White, in dissenting from a refusal to grant certiorari, stated:

> Our traditional rule has been, however, that a facial challenge must be rejected unless there exists no set of circumstances in which the statute can constitutionally be applied.
> . . .
> The Court did not purport to change this well-established rule last Term in [*Casey*].

*Ada v. Guam Society of Obstetricians & Gynecologists*, —— U.S. ——, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992). Later, Justices O'Connor and Sout-

Instead of determining whether the law cannot be applied constitutionally in *any* circumstance, the court must look to the relevant class of people likely to be affected by the law and determine whether the law cannot be applied constitutionally in a large fraction of those cases.[9]

▇ This new standard changes the focus as to whom the law will affect. It does not, however, change the standard for statutory interpretation under a facial challenge. Courts must still interpret the statute in a manner which will favor its constitutionality, if the statute is capable of such an interpretation.

▇ Accordingly, to bring a facial challenge in good faith, one must reasonably believe that the statute is incapable of being applied constitutionally in a large fraction of the cases in which it is relevant.

In the present case, it is clear that plaintiffs could not have reasonably had such a belief. Plaintiffs now readily concede that if S.B. 60 is interpreted so as to allow for telephonic communication, it does not impose an undue burden on the women for whom the law is relevant. Notwithstanding plaintiffs' knowledge that S.B. 60 was capable of constitutional interpretation and application in relevant cases, plaintiffs initiated this facial challenge—alleging that the statute was incapable of such application. This suggests plaintiffs' bad faith.

Plaintiffs submit that this lawsuit was initiated based upon the fear that S.B. 60 would be interpreted so as to require two visits to the clinic by all women. Because the Utah Attorney General refused to answer their inquiries on this point, plaintiffs argue, they were required to make an "assumption" that S.B. 60 would be enforced in that manner. Plaintiffs claim to have filed this lawsuit based upon that assumption.

This explanation does not save plaintiffs from a finding of bad faith. Rather, it confirms it.

▇ An assumption of possible unconstitutional enforcement does not justify bringing a facial challenge. A worst-case interpretation may not be used to strike down a statute which has another plausible constitutional interpretation. Furthermore, as discussed earlier in this opinion, the plaintiffs could not in any event have argued in good faith that the Utah law had to allow for telephone communication in order to be constitutional in light of *Casey's* constitutional validation of two face-to-face visits.

---

er, in concurring with a denial of certiorari, explained:

> In striking down Pennsylvania's spousal-notice provision, we did not require petitioners to show that the provision would be invalid in all circumstances. Rather, we made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." And the joint opinion specifically examined the record developed in the district court in determining that Pennsylvania's informed-consent provision did not create an undue burden.

*Fargo Women's Health Organization v. Schafer,* — U.S. —, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993) (citation omitted). For purposes of this memorandum, the court will follow the analysis of the Magistrate Judge, *Report & Recommendation,* at 90–92, in applying the interpretation of Justice O'Connor.

9. At oral argument, plaintiffs tried to contend that the relevant class of women should be construed narrowly. They would have the court limit the class to those women who are particularly burdened by the law.

Such a construction, however, turns the facial challenge analysis on its head. It is no test at all. If the class is drawn too narrowly, a finding of undue burden in one abberational circumstance would be enough to strike down the law. Plaintiffs would, in effect, have the court draw the class to encompass only those women for whom the law would be an undue burden. This would render the facial challenge meaningless and nonsensical.

In the instant case, plaintiffs' challenge was certified as a class action. Pursuant to stipulation of the parties, that class was defined as:

> All women who currently, or will in the future, seek an abortion in the State of Utah, and all women who currently, or who will in the future, seek or obtain information regarding their options with respect to pregnancy, when such information is required to be given by Utah Code Ann. §§ 76–7–305 and 76–7–305.5, as amended by Utah Senate Bill 60 of 1993.

(dkt. 49). This is clearly the class to which the law is relevant.

When a plaintiff has a legitimate fear that a facially valid statute will be enforced in an unconstitutional manner, the proper remedy is to see if the statute is in fact enforced in an invalid manner. If it is, the plaintiff may properly raise an "as-applied" challenge to the statute. It is not proper, however, to file a bad faith and groundless facial challenge, as the plaintiffs have done here, in the hopes of getting an advisory opinion as to how the statute should be interpreted.

## C. The Scope of the Casey Decision.

The parties in this case disagree as to the extent to which *Casey* governs the issues in this case. Defendants submit *Casey* is controlling and that S.B. 60 falls squarely within the scope of that decision. Plaintiffs argue that the scope of *Casey* is more narrow. They submit that because the Court in *Casey* relied on the factual record in making its determinations, each subsequent abortion law must be scrutinized on an individual basis, based upon its own factual record.

The Court in *Casey* did not purport to create a *per se* rule as to the constitutionality of future abortion legislation. Under *Casey*'s new standard the court must, even in the context of a facial challenge, look at the factual record to determine the statute's impact on the relevant class of women. However, where an abortion statute is equally (or less) restrictive than the Pennsylvania statute upheld in *Casey*, a review of the factual record would be a futile exercise unless there is a reasonable expectation that circumstances in the forum state are materially different from circumstances in Pennsylvania, so that the same restriction, which is not unduly burdensome in Pennsylvania, would be found to impose an undue burden in the forum state.

In the instant case, because S.B. 60 is less restrictive than the Pennsylvania abortion statute, plaintiffs may not prevail unless they show material differences between the circumstances of Utah and Pennsylvania.

Plaintiffs have not met this burden. An examination of the record reviewed by the Supreme Court in *Casey* reveals the extent to which that case is controlling in the instant case. There, the district court made specific findings as to the effects of the Pennsylvania law. The district court found that the law, among other things, would: require at least two visits for every woman (as discussed above); force women to double their travel time, or stay overnight; increase the cost of the abortion; increase the opportunity for harassment from anti-abortion demonstrators; and create a significant delay for most abortions—ranging from 48 hours to two weeks. The district court found that the delay would have a negative impact on the physical and psychological health of some women and that it would increase the medical danger of the abortion in some cases. It further found that the requirement would be "particularly burdensome" for poor women, young women, battered women, working women, and women from rural areas. *See Casey I*, 744 F.Supp. at 1351–52. Notwithstanding these findings on the record, and based thereon, the United States Supreme Court held that the Pennsylvania law is not unconstitutional. The High Court stated: "These findings are troubling in some respects, but they do not demonstrate that the waiting period constitutes an undue burden." *Casey*, —— U.S. at ——, 112 S.Ct. at 2825.

A review of plaintiffs' Complaint in the instant case shows no factual allegations materially different from those already considered by the United States Supreme Court in *Casey*. Plaintiffs allege that S.B. 60 will burden the right to abortion by: forcing overnight stays, increasing travel and medical costs, delaying the abortion procedure, increasing medical risks, interfering with the physician's discretion, and increasing opportunities for harassment by anti-abortion protestors. Plaintiffs also stress the particular burden that S.B. 60 will place on poor, disadvantaged, employed, young, and battered women. *See Amended Complaint*, at 35–47 (dkt. 23).

None of these alleged burdens is different from the record in *Casey*.[10] Each allegation was included in the findings of the Pennsylvania district court. They have been duly considered and rejected as constituting un-

---

10. At oral argument, plaintiffs contended that the *Casey* Court did not consider the statute's effect

due burdens by the United States Supreme Court. There is nothing significantly different between Utah's S.B. 60 and the Pennsylvania statute, and there is nothing significantly different in the way in which the statutes will affect women in Utah as compared to women in Pennsylvania.[11]

Plaintiffs would have this court reach the anomalous conclusion that, although there are no material differences between the two states, a law which is constitutional in one state is facially unconstitutional in the other.

Plaintiffs had no case from the beginning. Even if all of plaintiffs' allegations are accepted as fact, under *Casey* S.B. 60 imposes no undue burden on the right to an abortion. Where a state passes abortion legislation which is less than or equal to the restrictions imposed by the Pennsylvania law, and where the plaintiffs are unable to allege any impact from the legislation which is more burdensome than was found by the district court in

*Casey*, there is no viable legal cause of action. Under the broad scope of *Casey*, it would be extremely difficult, if not impossible, to bring a good faith facial challenge to the constitutionality of Utah's 24 hour waiting period/informed consent requirements.

## II. THE MEDICAL EMERGENCY EXCEPTIONS

*Background*

 Utah's medical emergency exception is governed by three sections of the statute: Utah Code Ann. § 76–7–305(1) ("section 305(1)"); Utah Code Ann. § 76–7–305(2) ("section 305(2)"); and Utah Code Ann. § 76–7–315 ("section 315").

*Section 305(1): The waiting period and information requirement; medical emergency exception*

This section of S.B. 60 imposes the 24 hour waiting period and the informed consent re-

---

on rape victims and women with fetal anomalies. Such women, plaintiffs assert, are more likely to seek late-term abortions. Plaintiffs argue that the stress caused by a waiting period/information requirement may cause such women to suffer physical and psychological damage.

The record reviewed by the Court in *Casey*, however, contained a finding that the statute would delay the performance of abortions and that it would have a negative impact on the physical and psychological health of some women. *See Casey I*, 744 F.Supp. at 1351–52. These findings were found in *Casey* to be insufficient to impose an undue burden on a facial challenge.

Plaintiffs' allegations might add two more categories to the class of women to whom the statute is "particularly burdensome." They do not, however, show that the burden is any greater than what was found to be constitutionally permissible by the United States Supreme Court in *Casey*.

11. It could be argued that because Utah is geographically larger than Pennsylvania, with only one major metropolitan area, the waiting period's burden is greater on rural women in Utah because they have farther to travel to get to the abortion clinic. This argument, however, is a red herring. The burden imposed by the waiting period is the same for rural women in both states.

All women seeking abortions, whether or not there are any state laws regulating abortion, are required to travel to the clinic to have the abortion performed. This travel burden is not a factor of state law. The fact that travel is in-

volved in getting to a clinic has absolutely nothing to do with the constitutional inquiry here. A woman in Alaska, for example, could be required to travel 800 miles to get to an abortion clinic merely because she lives in one place and the nearest abortion clinic is on the other side of the state. But that certainly doesn't constitute anything even approaching an undue burden. *Roe v. Wade* may have established a constitutional right to an abortion, but it did not require that a state provide abortion clinics in close proximity to every woman's home.

On the other hand, a waiting period which may require two visits to a clinic imposes an additional burden. For some women, this burden will require that they double their travel time by making a second trip to the clinic. For other women, in a worst-case scenario where the distance is such that it is impracticable to make a return visit, the burden will require an overnight stay at a location near the clinic.

Regardless of the distance required to travel to the clinic, then, the most severe burden imposed by the waiting period is the same for women in both Utah and Pennsylvania—an overnight stay at a location near the clinic. Thus, women in rural Utah who live great distances from the clinic will not have to double their travel time. Their burden, like rural women in Pennsylvania, will be the cost of an overnight stay near the clinic.

In *Casey*, the Supreme Court determined specifically that a law which requires a second trip to the clinic, or an overnight stay near the clinic, *see Casey I*, 744 F.Supp. at 1352, does not impose a substantial obstacle to the woman's right to an abortion. *See Casey*, —— U.S. at ——, 112

quirement. However, the section also contains an exception for medical emergencies.[12] By the very terms of section 305(1), its requirements do not apply when there is a medical emergency. In an emergency situation, there is never a requirement of informed consent or a 24 hour waiting period.

Accordingly, plaintiffs' statement that "S.B. 60, when read together with provisions from Utah's 1991 abortion law, does not clearly provide that a woman can obtain an immediate abortion when necessary in a medical emergency," is not true. *Plaintiffs' Objections*, at 15. There is simply no waiting period requirement in the case of a medical emergency.

*Section 305(2): The alternative information requirement in medical emergency situations*

As stated above, when there is a medical emergency, the information required in section 305(1) need not be given. In such a circumstance, however, section 305(2) requires that, if possible, certain alternative information be given to the woman. This section states that, prior to performing the abortion, the physician shall inform the woman "of the medical indications supporting his judgment that an abortion is necessary." Such information, which is hardly burdensome or unreasonable, is the only information required to be given, if possible, in the case of a medical emergency.

*Section 315: An exception to the alternative information requirement of section 305(2)*

Section 315 states that even the alternative information of section 305(2) need not be given when, "due to a serious medical emergency, time does not permit compliance with

[section 305(2) ]." Thus, there are two exceptions to the alternative information requirement of section 305(2). The first is found in the language of section 305(2) itself—the information need only be given "if possible." The second is found in section 315—the information need not be given if, because of a serious medical emergency, time does not permit that the information be given.

In summary, there is no waiting period in a medical emergency situation. The physician need only tell the woman why the abortion is medically necessary. If, however, it is not possible to do so, or if the medical emergency is such that time does not permit, the physician need not give any information at all.

*Plaintiffs' Objection to the Medical Emergency Sections*

Although they object to the Report and Recommendation's analysis of the medical health exceptions, plaintiffs submit that the court must adopt the Magistrate Judge's finding as to how the law is to be construed. Plaintiffs urge the court to construe the Utah abortion law so as "to assure that compliance with its abortion regulations would not in any way pose a significant threat to the life or health of a woman." *Planned Parenthood v. Casey*, —— U.S. at ——, 112 S.Ct. at 2822 (quoting *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 947 F.2d 682, 701 (3d Cir.1991)). *See Report & Recommendation*, at 74.[13]

Notwithstanding such a construction, plaintiffs assert that "the Utah law would still not adequately protect the lives and health of some women seeking abortions in

---

S.Ct. at 2825–26. Plaintiffs' longer-travel-distance arguments in this case are utterly specious.

**12.** The term "medical emergency" is defined in Utah Code Ann. § 76-7-301(2) as:

> that condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death, or for which a delay will create serious risk of substantial and irreversible impairment of major bodily function.

This definition is nearly identical to the Pennsylvania medical health exception, which was

upheld by the Supreme Court in *Casey*, —— U.S. at ——, 112 S.Ct. at 2822.

**13.** This construction was applied by the Third Circuit Court of Appeals in evaluating the emergency medical exception to the Pennsylvania law. The Supreme Court adopted this construction in *Casey*.

The Magistrate Judge determined that the Utah law should be construed in the same manner. He reasoned that "[w]here the Utah Legislature adopted the ʼ[statute] from Pennsylvania, the Utah legislature must have intended the prior judicial construction to also be adopted." *Report & Recommendation*, at 75 n. 25.

Utah." *Plaintiffs' Objections*, at 14. Specifically, plaintiffs argue that "the various overlapping and conflicting health exceptions to S.B. 60" are unconstitutionally vague. *Plaintiffs' Objections*, at 13. Plaintiffs allege that there are conflicts between two provisions of the statute which cannot be resolved and which, in effect, render the exception meaningless and unconstitutional.

Plaintiffs express confusion as to how section 315, from the 1991 law, affects the provisions of the 1993 law. Sections 315 and 305(1), plaintiffs allege, are so conflicting and confusing that "there is, in effect, *no* medical emergency exception to the waiting period requirement." *Plaintiffs' Objections*, at 14–15.

The court finds plaintiffs' arguments to be wholly unpersuasive and without legal foundation. They are inconsistent and illogical.[14] They show apparent misunderstanding and confusion as to the clear language of the 1993 law.

Section 315 can in no way be construed to impact or nullify the medical emergency exception of section 305(1). Section 315 does not even apply to section 305(1). The two sections are mutually exclusive and would never be used in the same situation. Section 315 only applies in the case of a serious medical emergency. By its own terms, section 305(1) does not apply when there is a medical emergency. Accordingly, when there is no medical emergency, section 315 is completely irrelevant and inapplicable. When there is such an emergency, section 305(1) does not apply.

The two sections articulate different standards which are used to make different determinations. The "medical emergency" standard of section 305(1), as defined in section 301(2), is used to determine when the waiting period and informed consent requirements apply. The "serious medical emergency" standard of section 315 is used to determine whether the alternative information required in section 305(2) need be given prior to the abortion. Section 315 imposes no additional requirements on the physician. Rather, it provides the physician with greater leeway in determining whether to provide the alternative information.

No conceivable application of section 315 would negate the medical emergency exception of section 305(1). When a medical emergency threatens the life or health of the woman, the 24 hour waiting period and information requirements of section 305(1) simply do not apply.

Plaintiffs complain that "neither the Magistrate Judge nor defendants explained how the 'serious medical emergency' exception applies in the context of S.B. 60." *Plaintiffs' Objections*, at 19. That question is easily answered by the statute itself: The "serious medical emergency" situation is an exception to the alternative information requirement of section 305(2). When the physician determines that the emergency is such that time will not permit telling the patient the medical reasons for the abortion, the physician need not do so. This "serious medical emergency" exception applies *only* to the alternative information requirements of section 305(2). It has no application whatsoever to the information and waiting period requirements of section 305(1).

The court finds no merit in plaintiffs' arguments as to the application of section 315 to the waiting period and information requirements of S.B. 60. Accordingly, plaintiffs' objection is overruled.

Plaintiffs also object to the alleged overlap and conflict between the "if possible" exception of section 305(2) and the "serious medical emergency" exception of section 315. Plaintiffs' objections on this point are also without merit and are rejected by the court.

First, plaintiffs misstate the finding of the Report and Recommendation. Contrary to plaintiffs' assertion, the Magistrate Judge does not equate "if possible" with the medical condition being "serious." These are two

---

14. For example, it is difficult to reconcile plaintiffs' statement that the Utah law must be construed to "not in any way pose a significant threat to the life or health of a woman," with its bold assertion that, notwithstanding such a construction, the law "would still not adequately protect the lives and health of some women seeking abortions in Utah." *Plaintiffs' Objections*, at 14.

separate conditions, and are listed as two separate exceptions to the information requirement of section 305(2).[15]

There is nothing about section 315, as it is applied to section 305(2), which is unconstitutionally vague. Although the phrase "serious medical emergency" is not defined in the statute, a reasonable physician in the large fraction of cases would be able to determine whether, under the circumstances of the emergency, time would permit him or her to inform the woman as to why the abortion is medically necessary. The key focus is not the degree of seriousness of the emergency, but whether time will permit the information to be given.

The language of S.B. 60—its statutory framework and medical emergency exceptions—is sufficient to satisfy the standards of due process. Plaintiffs have failed to articulate one reasonable construction of section 315 which would endanger medical health. The court can conceive of no situation where a physician would be unable to understand and apply the Act in a manner which would fully protect the life and health of the woman. No reasonable physician, acting in good faith, need fear prosecution under this Act.

### SUMMARY AND CONCLUSION

Although personal beliefs on the issue of abortion may vary widely, the people of a democratic state may, through their elected representatives, assert an interest in protecting the life of the unborn so long as that protection does not violate the constitutional rights of women.

In 1993, the state of Utah passed S.B. 60, with the specific purpose of restricting abortion without violating the Constitution. The law was closely patterned after the Pennsylvania law upheld by the United States Supreme Court in *Planned Parenthood v. Casey*. Where the Utah law varies from the Pennsylvania law, it is even less restrictive and therefore less likely to violate the Constitution.

Nevertheless, plaintiffs initiated this lawsuit as a constitutional facial challenge to the Utah law. As a result, enforcement of the law has been delayed for nearly nine months, and the state of Utah has been required to engage in lengthy litigation in defending the law.

Where, as with the 1991 Utah law, the people of a state enact a law which clearly approaches or exceeds the bounds of constitutional propriety, they may well expect to defend the law against a facial challenge in federal court. However, when a duly enacted law remains clearly within the bounds of the Constitution, as set forth by clear Supreme Court authority, the state should not be unnecessarily subjected to the cost and delay of defending an unmeritorious challenge to the law.

The abortion issue is obviously one which invokes strong feelings on both sides. Individuals are free to urge support for their cause through debate, advocacy, and participation in the political process. The subject might also be addressed in the courts so long as there are valid legal issues in dispute. Where, however, a case presents no legitimate legal arguments, the courthouse is not the proper forum. Litigation, or the threat of litigation, should not be used as economic blackmail to strengthen one's hand in the political battle. Unfortunately, the court sees little evidence that this case was filed for any other purpose.

In the present case, the court has conducted a *de novo* review of the Magistrate Judge's Report and Recommendation and plaintiffs' objections. The Report and Recommendation is extremely thorough and con-

---

**15.** Granted, the two terms may often overlap. In a situation where the emergency is such that time will not permit the physician to give the reasons for the abortion, it might be said that it is "not possible" to give such information.

However, as plaintiff argues, there may be circumstances where it is theoretically "possible" to convey the information, but where the emergency is such that time would not permit that the information be given without risk to health or life. The opposite might also occur. *See* discussion by the plaintiffs in *Plaintiffs' Objections*, at 19.

Accordingly, the two exceptions do not completely overlap, and section 315 is not mere surplusage. Section 315 gives the physician more, not less, leeway in determining whether to give the alternative information of section 305(2) in a medical emergency situation.

scientious. This case is governed by *Casey*. There is nothing in the language of the Utah statute to make it significantly different from the Pennsylvania statute. Similarly, there is nothing in the application of these laws whether in the western towns and cities of Utah or the eastern towns and cities of Pennsylvania to demonstrate a constitutional deficiency in the Utah law. The factual record examined by the United States Supreme Court in *Casey* is in all material respects the same as the factual record examined in this case. The plaintiffs' factual submissions, legal propositions, and objections to the Magistrate Judge's Report and Recommendation are entirely without merit. With *Casey* being so clearly the United States Supreme Court's pronouncement on the legal and factual issues now before this court, and with there being no question that it is this court's clear obligation to follow that pronouncement, it would be remiss in the extreme for this court to do otherwise than summarily dismiss plaintiffs' case.

S.B. 60, the duly enacted law of the people of Utah, has not been enforced for nearly nine months. That will change today. The court hereby adopts the Report and Recommendation of the Magistrate Judge, lifts the injunction, and dismisses plaintiffs' case in its entirety with prejudice.

Because of the absence of merit in support of plaintiffs' case and the legal frivolousness of plaintiffs' assertions in this facial challenge, plaintiffs are ordered to pay defendants' costs and attorney's fees.

IT IS SO ORDERED.