In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-2107

A WOMAN'S CHOICE–EAST SIDE WOMEN'S CLINIC, *et al.*,

*Plaintiffs-Appellees*,

*v.*

SCOTT C. NEWMAN, Prosecuting Attorney for Marion
County Indiana, on behalf of a class of prosecutors, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 95-C-1148-C-H/G—**David F. Hamilton**, *Judge*.

ARGUED FEBRUARY 19, 2002—DECIDED SEPTEMBER 16, 2002

Before COFFEY, EASTERBROOK, and DIANE P. WOOD,
*Circuit Judges*.

EASTERBROOK, *Circuit Judge*. In 1995 Indiana enacted
a statute making the woman's informed consent a condi-
tion to an abortion. Ind. Code §16-34-2-1.1. Even though
the text of this law is materially identical to one held con-
stitutional in *Planned Parenthood of Southeastern Penn-
sylvania v. Casey*, 505 U.S. 833, 881-87 (1992), a federal
district court issued a preliminary injunction preventing
the statute from taking effect. *A Woman's Choice–East
Side Women's Clinic v. Newman*, 904 F. Supp. 1434 (S.D.
Ind. 1995). Two years later, the district court modified this

injunction to permit the state to enforce most of the law, but it blocked enforcement of the requirement that information be provided "in the presence of the pregnant woman, [by] the physician who is to perform the abortion, the referring physician or a physician assistant" (§16-34-2-1.1(1)). See 980 F. Supp. 962 (1997). After four more years had passed, the judge held a trial and made permanent the injunction as modified in 1997. 132 F. Supp. 2d 1150 (2001).

By requiring information to be supplied "in the presence of the pregnant woman"—rather than by printed brochure, telephone, or web site—the statute obliges the woman to make two trips to the clinic or hospital. This raises the cost (both financial and mental) of an abortion. On the basis of studies concerning similar laws in Mississippi and Utah, the district court concluded that the higher cost will reduce by 10% to 13% the number of abortions performed in Indiana. Some of these women will travel to states that do not require two trips; others will forego an abortion; some who do have an abortion in Indiana will delay that procedure until the second trimester. These consequences show that the law creates an "undue burden" on abortion, the district judge held. Although by the time the district judge entered the permanent injunction we had concluded that the Mississippi study does not warrant condemnation of Wisconsin's law (which like Pennsylvania's requires two trips to the medical facility and a 24-hour wait), see *Karlin v. Foust*, 188 F.3d 446, 484-88 (7th Cir. 1999), the district judge wrote that data from the Utah study, and a new analysis of the Mississippi data, require a different result. The judge also thought that experience in Indiana showing that the demand for abortion did not decline when information was provided on paper or over the telephone implies that the reduction in the number of abortions is attributable to higher cost (a bad reason) rather than to the statutory information (a valid reason).

Indiana's statute reads as follows:

> An abortion shall not be performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed. Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if the following conditions are met:
>
> > (1) At least eighteen (18) hours before the abortion and in the presence of the pregnant woman, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice nurse (as defined in IC 25-23-1-1(b)), or a midwife (as defined in IC 34-18-2-19) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician has orally informed the pregnant woman of the following:
> >
> > > (A) The name of the physician performing the abortion.
> > >
> > > (B) The nature of the proposed procedure or treatment.
> > >
> > > (C) The risks of and alternatives to the procedure or treatment.
> > >
> > > (D) The probable gestational age of the fetus, including an offer to provide:
> > >
> > > > (i) a picture or drawing of a fetus;
> > > >
> > > > (ii) the dimensions of a fetus; and
> > > >
> > > > (iii) relevant information on the potential survival of an unborn fetus;
> > > >
> > > > at this stage of development.
> > >
> > > (E) The medical risks associated with carrying the fetus to term.

(2) At least eighteen (18) hours before the abortion, the pregnant woman will be orally informed of the following:

(A) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care from the county office of family and children.

(B) That the father of the unborn fetus is legally required to assist in the support of the child. In the case of rape, the information required under this clause may be omitted.

(C) That adoption alternatives are available and that adoptive parents may legally pay the costs of prenatal care, childbirth, and neonatal care.

(3) The pregnant woman certifies in writing, before the abortion is performed, that the information required by subdivisions (1) and (2) has been provided.

When the litigation began, plaintiffs challenged not only the requirement that advice be delivered in person but also the medical-emergency exception, which they deemed insufficient because it lacks details found in the Pennsylvania statute. The district court certified the medical-emergency issue to the Supreme Court of Indiana, whose interpretation, see *A Woman's Choice–East Side Women's Clinic v. Newman*, 671 N.E.2d 104 (Ind. 1996), satisfied the district judge. See 980 F. Supp. at 966. Plaintiffs then dropped this objection, leaving only the advice requirement as a ground of contention.[†]

---

[†]  For comparison, we reproduce the substantive portions of the statute at issue in *Casey*, 18 Pa. Cons. Stat. §3205:

(continued...)

† (...continued)

(a) No abortion shall be performed or induced except with the voluntary and informed consent of the woman upon whom the abortion is to be performed or induced. Except in the case of a medical emergency, consent to an abortion is voluntary and informed if and only if:

(1) At least 24 hours prior to the abortion, the physician who is to perform the abortion or the referring physician has orally informed the woman of:

(i) The nature of the proposed procedure or treatment and of those risks and alternatives to the procedure or treatment that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

(ii) The probable gestational age of the unborn child at the time the abortion is to be performed.

(iii) The medical risks associated with carrying her child to term.

(2) At least 24 hours prior to the abortion, the physician who is to perform the abortion or the referring physician, or a qualified physician assistant, health care practitioner, technician or social worker to whom the responsibility has been delegated by either physician, has informed the pregnant woman that:

(i) The department publishes printed materials which describe the unborn child and list agencies which offer alternatives to abortion and that she has a right to review the printed materials and that a copy will be provided to her free of charge if she chooses to review it.

(ii) Medical assistance benefits may be available for prenatal care, childbirth and neonatal care, and that more detailed information on the availability of such assistance is contained in the printed materials published by the department.

(continued...)

---

† (...continued)

        (iii) The father of the unborn child is liable to assist in the support of her child, even in instances where he has offered to pay for the abortion. In the case of rape, this information may be omitted.

    (3) A copy of the printed materials has been provided to the pregnant woman if she chooses to view these materials.

    (4) The pregnant woman certifies in writing, prior to the abortion, that the information required to be provided under paragraphs (1), (2) and (3) has been provided.

(b) Where a medical emergency compels the performance of an abortion, the physician shall inform the woman, prior to the abortion if possible, of the medical indications supporting his judgment that an abortion is necessary to avert her death or to avert substantial and irreversible impairment of major bodily function.

(c) . . . No physician shall be guilty of violating this section for failure to furnish the information required by subsection (a) if he or she can demonstrate, by a preponderance of the evidence, that he or she reasonably believed that furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient.

Pennsylvania thus requires essentially the same advice as Indiana, provided "orally" by the physician, 24 hours before the abortion. It is more restrictive than Indiana's law in two ways: Pennsylvania requires a 24-hour waiting period versus 18 in Indiana, and it requires the physician to deliver the information while Indiana allows a range of medical personnel. The defense in subsection (c) of the Pennsylvania statute has no direct parallel in Indiana's law, but the Supreme Court of Indiana has read the "medical emergency" proviso in Indiana's law to achieve the same basic effect. See *A Woman's Choice–East Side Women's Clinic v. Newman*, 671 N.E.2d 104 (Ind. 1996). Neither side contends that any remaining difference between the statutes is material.

Indiana makes much of the fact that its statute has never been allowed to operate as written. It relies on *United States v. Salerno*, 481 U.S. 739, 745 (1987), for the proposition that, except in first amendment cases, a law may be held unconstitutional only when "no set of circumstances exists under which the Act would be valid." Yet in *Stenberg v. Carhart*, 530 U.S. 914 (2000), without so much as a mention of *Salerno*, the Court held invalid, in a pre-enforcement challenge, an abortion statute that might have been construed by the state courts to have at least some proper applications. This leaves us with irreconcilable directives from the Supreme Court. The Justices have insisted that courts lower in the hierarchy apply their precedents unless overruled, even if they seem incompatible with more recent decisions. See, e.g., *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). When the Justices themselves disregard rather than overrule a decision—as the majority did in *Stenberg*, and the plurality did in *Casey*—they put courts of appeals in a pickle. We cannot follow *Salerno* without departing from the approach taken in both *Stenberg* and *Casey*; yet we cannot disregard *Salerno* without departing from the principle that only an express overruling relieves an inferior court of the duty to follow decisions on the books. See also, e.g., *Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014 (7th Cir. 2002) (following *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), even though it is incompatible with the rationale of more recent decisions). *Troxel v. Greenville*, 530 U.S. 57, 85 n.6 (2000), offers us a way out by calling the language in *Salerno* a "suggestion," an approach not essential to *Salerno*'s judgment. Given the incompatibility between *Salerno*'s language and *Stenberg*'s holding, it is the language of *Salerno* that must give way.

Still, to say that a claim is justiciable does not mean that we must ignore the fact that enforcement has not com-

menced. Plaintiffs rely on predictions about what is likely to happen if Indiana's law were enforced as written. Because Indiana has been disabled from implementing its law and gathering information about actual effects, any uncertainty about the inferences based on other states' experience and how that experience would carry over to Indiana must be resolved in Indiana's favor. This, coupled with doubts about the role of predictions in constitutional analysis, turns out to be important, for reasons explained presently.

*Casey* stated, and *Karlin* reiterated, that an informed-consent statute may have effects that differ from the written terms, and that those effects could in principle demonstrate that an innocuous-appearing law actually imposes an undue burden on abortion. But neither decision explained how such factual arguments are to be evaluated: before implementation or after?, using what standards? Normally a court asked to say that a statute will have forbidden effects asks only whether a proper outcome is possible; it does not hold a trial—and, if a district judge nonetheless takes evidence and makes findings, the appellate court will reexamine matters with a heavy presumption favoring the law's constitutional application. See, e.g., *Vance v. Bradley*, 440 U.S. 93, 111 (1979); *National Paint & Coatings Ass'n v. Chicago*, 45 F.3d 1124 (7th Cir. 1995). One may say in response that these cases deal with rational-basis review, while abortion implicates fundamental rights. But laws that regulate, not abortion itself, but ancillary issues (such as informed consent), do not affect fundamental rights *unless* the ancillary rule creates an undue burden on the underlying right. How does the court handle factual disputes that bear on *whether* an undue burden has been created? It cannot simply assume that a fundamental right has been burdened; that begs the question.

*Stenberg* shows that the undue-burden standard must be applied at the level of logic, and to the nation as a whole, rather than one state at a time. Nebraska forbade use of "intact dilation and extraction" (D&X), a method of late-term abortion. *Stenberg* believed that this ban would have unacceptable consequences because it would induce physicians to steer clear of other procedures similar to the D&X. Nebraska's law therefore was held unconstitutional, as an undue burden on abortion, without the need for a trial. Meanwhile a trial *had* been held in Wisconsin, where the district judge found as a fact that the untoward consequences anticipated in *Stenberg* would not occur. *Planned Parenthood of Wisconsin v. Doyle*, 44 F. Supp. 2d 975 (W.D. Wis. 1999), affirmed under the name *Hope Clinic v. Ryan*, 195 F.3d 857 (7th Cir. 1999) (en banc), remanded, 530 U.S. 1271 (2000), decision on remand, 249 F.3d 603 (2001) (en banc). The Supreme Court vacated our decision without regard to the district court's findings; it was of the view (as we likewise had concluded, 195 F.3d at 872-73) that constitutionality must be assessed at the level of legislative fact, rather than adjudicative fact determined by more than 650 district judges. Only treating the matter as one of legislative fact produces the nationally uniform approach that *Stenberg* demands. This worked against the partial-birth-abortion laws in *Stenberg* but has worked in favor of other laws: the Court has held it constitutional to prevent non-physicians from performing abortions, see *Mazurek v. Armstrong*, 520 U.S. 968 (1997), without factual inquiries into whether other medical professionals could do the job as safely, and how much prices may be elevated by a physician-only rule.

Findings based on new evidence could produce a new understanding, and thus a different legal outcome; the plurality implied this in *Casey*, as did we in *Karlin*. But if the issue is one of legislative rather than adjudicative

fact, it is unsound to say that, on records very similar in nature, Wisconsin's law could be valid (as we held in *Karlin*) and Indiana's law invalid, just because different district judges reached different conclusions about the inferences to be drawn from the same body of statistical work. Because the Supreme Court has not made this point explicit, however, and because the undue-burden approach does not prescribe a choice between the legislative-fact and adjudicative-fact approaches, we think it appropriate to review the evidence in this record and the inferences that properly may be drawn at the pre-enforcement stage.

The district court found that the two-visit requirement in Mississippi and Utah reduced the number of abortions performed in those states by about 10% compared with neighboring states that do not require multiple visits. The judge also found that the number of abortions performed in Indiana has not declined because of the advice given to women under Ind. Code §16-34-2-1.1, though not necessarily in person (because that aspect of the statute has been enjoined). Indiana asks us to set aside these findings, but review under Fed. R. Civ. P. 52(a) is highly deferential, see *Anderson v. Bessemer City*, 470 U.S. 564 (1985), and we cannot say that the district court's findings are clearly erroneous. The studies' conclusions were hotly debated on both medical and statistical grounds, but the district judge dealt responsibly with these arguments pro and con, and his findings cannot be upset. But what happened in Mississippi and Utah, a question of historical fact on which appellate review is deferential, does not necessarily ordain what *will* happen in Indiana—or whether what is likely to happen in Indiana amounts to an "undue burden." That admixture of fact and law, sometimes called an issue of "constitutional fact," is reviewed without deference in order to prevent the idiosyncrasies of a single judge or jury from having far-

reaching legal effects. Only the findings of historical fact are sheltered by Rule 52(a). Thus our consideration of the studies' *significance* is not deferential. See *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001) (constitutionality of punitive damages is reviewed *de novo*); *Ornelas v. United States*, 517 U.S. 690 (1996) (probable cause for a search or seizure is reviewed *de novo* in the absence of a warrant); *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984) (factual disputes that determine constitutionality under the first amendment are reviewed *de novo*). Cf. *Los Angeles v. Alameda Books, Inc.*, 122 S. Ct. 1728 (2002) (without discussing the standard of review, all nine Justices freely substitute their judgment for that of the district and appellate judges on the significance of an empirical study in a constitutional suit). See also Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229 (1985).

By concluding that the empirical work had been carried out competently, the district judge established (for purposes of this litigation) that abortions dropped in Mississippi, compared to those in South Carolina, during the year after Mississippi enacted a statute requiring two visits. The authors of this study (and its replication in Utah) did not ask how Mississippi compares with Indiana. The study does not include a regression based on the sorts of variables, such as urbanization, income, average distance to an abortion clinic, average price of abortion, and so on, that might enable conclusions drawn from Mississippi to be extrapolated with confidence to other states. That is one reason why we held in *Karlin* that the Mississippi study was a poor basis for predicting what would happen in Wisconsin, which we thought more similar to Pennsylvania than to Mississippi. 188 F.3d at 485-86.

That shortcoming could have been fixed in one of two ways. First, the authors could have conducted a more comprehensive study, with additional variables and regression coefficients that would reveal their effects. That was not done. Second, the authors (or other scholars) could have gathered data from other states to test whether (and, if so, how) state-specific characteristics affect the results. That was not done either. What *has* happened in Pennsylvania, Wisconsin, and the other states whose informed-consent laws require two visits? Did Mississippi prove to be a better predictor of Wisconsin than *Karlin* anticipated, or was the outcome in Wisconsin dissimilar? This record is silent on these matters. Mississippi and Utah, two states with a history of hostility to abortion and very few abortion providers (implying long travel times), may be poor models for other states. Indianapolis has multiple abortion clinics; another in Fort Wayne serves the northeastern portion of the state; women in the northwest and southeast can use not only local providers but also those just across the state lines in Chicago and Louisville. So just as in *Karlin* the application of the Mississippi data (and now Utah's data) to a different state would be a leap of faith. Here is where the pre-enforcement nature of this suit matters.

Plaintiffs did try to deal with another problem identified in *Karlin*: that the original Mississippi study did not try to separate the raw costs of a two-visit requirement from the effects of the information that was provided during the first visit. 188 F.3d at 486-88. The Supreme Court's first two encounters with informed-consent statutes treated these laws as meddling in the physician-patient relation with no valid purpose, and no effect other than to heap pointless costs on women. See *Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 442-49 (1983); *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 759-65 (1986). *Casey* over-

ruled both of these decisions and held that states may try to persuade women not to abort their pregnancies. Maybe all the Mississippi study reveals is successful persuasion, we observed in *Karlin*. In this case the plaintiffs tried to separate the effect of information from the effect of making two visits. Since 1997 Indiana has been able to enforce the portion of its informed-consent statute requiring the provision of certain information to women who inquire about abortions. Yet the number of abortions has not declined. This shows, the district judge wrote, that the law lacks persuasive effect; and if a decline in abortions cannot be attributed to persuasion, then the cause must lie in some other and impermissible feature of the law.

Yet this assumes what is to be proven: that Indiana is like Mississippi and Utah, so that the number of abortions would decline 10% or more if the law were enforced as written. Maybe what Indiana's experience since 1997 shows is that Indiana *differs* from Mississippi and Utah and will not experience a substantial decline, with or without multiple visits. Or maybe what it shows is that presenting the information in person is critical to its persuasive effect. Our education system rests on the premise that information delivered orally, with an opportunity for give-and-take, "takes" better than information delivered exclusively in writing. Otherwise a university would simply mail a syllabus to the freshman class and ask the students to appear four years later for exams. So the fact that advice delivered in writing or over the phone is uninfluential need not imply that advice delivered in person will be uninfluential. Once again the fact that Indiana has been blocked from enforcing its law as written means that the record does not contain evidence needed for accurate assessment of that statute's effects.

Then there is an open question what the 10% reduction reflects. Let us suppose that abortions would decline 10%

in Indiana if that state's law were fully enforced. What would the decline signify? One possibility is that many women who strongly want an abortion have been blocked by the cost (in money and time) of multiple visits to the clinic, or because the more times the woman must be absent the greater is the likelihood that an abusive parent, spouse, or partner would discover what the woman has planned and intervene notwithstanding the availability of the emergency bypass, which the Supreme Court of Indiana held to encompass *any* kind of threat to the woman's health or safety. See 671 N.E.2d at 108-09. Another possibility is that about 10% of all women who have abortions are on the fence between ending the pregnancy and carrying the pregnancy to term, so that even a modest cost tips the scales. If the former, then a two-visit rule might be deemed an undue burden; if the latter, the two-visit rule would not be an undue burden, for only a law that "has the purpose or effect of placing a *substantial obstacle* in the path of a woman seeking an abortion of a nonviable fetus" (*Stenberg*, 530 U.S. at 921; emphasis added; quoting from the plurality opinion in *Casey*) is an "undue" burden. This record does not permit (and the district judge did not make) an inference either way about the reason for the decline in Mississippi and Utah. Perhaps this shortcoming could be rectified by studying the effects of changes in out-of-pocket outlays or travel time as prices change, or clinics open, close, or move locations, but the studies in this record do not address the question.

Since 1992, when the plurality in *Casey* announced the "undue burden" standard, only two kinds of statute have flunked the test: a law forbidding the "intact dilation and extraction" (D&X) method of abortion (the subject of Stenberg) and a law requiring a woman to notify her husband before obtaining an abortion (discussed in *Casey* itself). Because the language used to describe the

D&X also could be understood to prohibit other proce-
dures that were common (and perhaps essential) to late-
term abortions, *Stenberg* concluded that the law would
forbid abortions altogether for substantial numbers of
women. The notification statute did not forbid abortions,
but the Court feared that it would come to the same
thing for those women whose husbands are likely to
respond violently to the notice (if not to any contact from
an estranged spouse). The plurality explained:

> The spousal notification requirement is thus likely
> to prevent a significant number of women from
> obtaining an abortion. It does not merely make
> abortions a little more difficult or expensive to
> obtain; for many women, it will impose a substan-
> tial obstacle. We must not blind ourselves to the
> fact that the significant number of women who fear
> for their safety and the safety of their children are
> likely to be deterred from procuring an abortion
> as surely as if the Commonwealth had outlawed
> abortion in all cases.

505 U.S. at 893-94. This record does not suggest that
*any* woman in Indiana faces an obstacle of that magni-
tude in visiting a clinic twice. As we have stressed, Indi-
ana's law has an emergency-bypass clause that has been
authoritatively interpreted to cover any kind of physical
or psychological risk to the woman. 671 N.E.2d at 108-09.
Plaintiffs do not contend that this interpretation falls
short of what *Stenberg* and *Casey* require for emergency-
bypass opportunities. It is accordingly difficult to see how
the sort of outcome that doomed the spousal-notification
rule could condemn Indiana's statute.

This is not to say that a two-visit requirement *could not*
create a burden comparable to a spousal-notice require-
ment. Quoting the district court, *Casey*'s plurality assumed
that "for those women who have the fewest financial re-

sources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24-hour waiting period will be 'particularly burdensome.'" 505 U.S. at 886. But it held these considerations insufficient to condemn the Pennsylvania statute. All that the record in the current case shows is that these costs are positive and have *some* effect—something that the plurality in *Casey* assumed. Likewise in *Mazurek* the Court assumed that a statute preventing nurses and other skilled medical personnel whose training falls short of the M.D. from performing abortions would increase the expense (and thus, by the Law of Demand, reduce the number) of abortions; this again was held insufficient to show invalidity even on the assumption that one legislative purpose was to curtail abortion.

The record in this case does not show that a two-visit rule operates similarly to a spousal-notification rule by facilitating domestic violence or even inviting domestic intimidation. It shows nothing except a decline in the number of abortions in Mississippi and Utah—leaving open both the extent to which other states would experience the same effect and the reason *why* the effect occurs. This is not the sort of evidence that permits an inferior federal court to depart from the holding of *Casey* that an informed-consent law is valid even when compliance entails two visits to the medical provider. If Indiana's emergency-bypass procedure fails to protect Indiana's women from risks of physical or mental harm, it will be a failure *in operation*; it is not possible to predict failure before the whole statute goes into force.

Justice Souter reached a similar conclusion when denying a request to set aside a post-*Casey* decision enforcing Pennsylvania's statute. See *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 510 U.S. 1309 (1994) (in chambers). Like the third circuit, whose decision, 14

F.3d 848 (1994), he declined to disturb, Justice Souter concluded that *Casey* itself had resolved the facial challenge to Pennsylvania's law. What remained was a challenge to the law in application, on a record showing how that law actually operated in Pennsylvania. 510 U.S. at 1311 & n.3. Just so in Indiana. For reasons we have given, what transpired in Mississippi need not portend what will happen in Indiana.

What is more, it would be incongruous to hold Indiana's informed-consent law invalid on the basis of studies covering Mississippi and Utah that (to the district judge's eyes) imply the *un*-constitutionality of the Mississippi and Utah statutes, while the laws continued to be implemented in Mississippi and Utah. Relying on *Casey*, the fifth circuit has allowed Mississippi to enforce its statute, see *Barnes v. Moore*, 970 F.2d 12 (5th Cir. 1992), and Utah's statute likewise has been sustained. See *Utah Women's Clinic, Inc. v. Leavitt*, 844 F. Supp. 1482, 1487, 1494 (D. Utah 1994), appeal dismissed in pertinent part for lack of jurisdiction, 75 F.3d 564 (10th Cir. 1995). No one has asked these courts to hold the Mississippi or Utah statute invalid on the basis of the local experience; and if these laws remain enforceable despite the consequences demonstrated in this record, it is difficult to see why Indiana's law should be unenforceable even though it is unclear whether similar effects would occur there. Indiana is entitled to an opportunity to have its law evaluated in light of experience *in Indiana*. And in the event the sort of effects that could make the burden undue—such as women deterred by the threat or actuality of violence at the hands of those tipped off by a preliminary visit—come to light in Indiana, then it will be informed-consent laws nationwide that must be reevaluated.

For seven years Indiana has been prevented from enforcing a statute materially identical to a law held valid

by the Supreme Court in *Casey*, by this court in *Karlin*, and by the fifth circuit in *Barnes*. No court anywhere in the country (other than one district judge in Indiana) has held any similar law invalid in the years since *Casey*. Although *Salerno* does not foreclose all pre-enforcement challenges to abortion laws, it is an abuse of discretion for a district judge to issue a pre-enforcement injunction while the effects of the law (and reasons for those effects) are open to debate. What happened in Mississippi and Utah does not imply that the effects in Indiana are *bound to be* unconstitutional, so Indiana (like Pennsylvania and Wisconsin) is entitled to put its law into effect and have that law judged by its own consequences.

REVERSED

COFFEY, *Circuit Judge*, concurring.

## I.

This case once again requires me to review the constitutionality of informed consent legislation in the context of the abortion industry. Seventeen years ago, I stated that a 24-hour waiting period enacted by the Illinois General Assembly was a reasonable and lawful means of ensuring that a woman has "at least a brief time to discuss and consider" the numerous moral, social, economical, practical, psychological, and medical factors "involved in reaching a mature, well-informed decision of whether or not to abort the pregnancy." *Zbaraz v. Hartigan*, 763 F.2d 1532, 1552 (7th Cir. 1985) (Coffey, J., dissenting). Similarly, I concluded three years later in another case from Illinois that the state is empowered to promote childbirth

and discourage abortion on demand by requiring abortionists to advise women about the reasonable alternatives to abortion, just as the state may require physicians to notify their patients about the risks and alternatives to many other invasive medical procedures. *See Ragsdale v. Turnock*, 841 F.2d 1358, 1396-97 (7th Cir. 1988) (Coffey, J., dissenting). Accordingly, for more than a decade, there has been authority for the view that a state legislature may require abortion clinics to provide expectant mothers "with a description of the procedure to be performed, an explanation of risks and possible complications, and a discussion of alternatives so that the woman can make a responsible enlightened choice" prior to terminating the life of her pre-born child. *Id.* at 1397.

In today's opinion, the majority of this panel embraces the dissenting opinions in *Zbaraz* and *Ragsdale*, rejects the abortion clinics' facial challenge, and allows the state of Indiana to enforce its informed consent statute. Although the dissent criticizes the majority for reversing the district court and "find[ing] flaws with the evidence on which the court based its factual findings"—findings which Judge Wood believes "should stand" regardless of "[w]hether this court is looking at the record *de novo*, under an abuse of discretion standard, or merely for clear error," *post* at 52, 60—I take issue with my colleague's criticism, for the "undue burden standard" applicable in this case may be uniformly applied only if appellate courts independently inquire whether the trial judge's findings of constitutional fact are firmly supported in the record and based upon a proper application of the law. *See*, *e.g.*, *Memphis Planned Parenthood Inc. v. Sundquist*, 175 F.3d 456 (6th Cir. 1999); *see also Planned Parenthood v. Casey*, 505 U.S. 833, 991 n.6 (1992) (Scalia, J., dissenting).

Judge Easterbrook succinctly and forcefully explains that the trial judge's conclusion in this case involves a "leap of faith" that events which may or may not be oc-

curring in Mississippi and Utah will be *replicated in Indiana. Ante* at 12. I add that the trial judge's factual findings in this case are based on a faulty study by biased researchers who operated in a vacuum of speculation. As even the dissent recognizes, the "key" piece of evidence relied upon by the district court was a study published in the August 27, 1997 *Journal of the American Medical Association* ("JAMA"), *post* at 56, and was co-authored by a statistician employed by the Planned Parenthood-affiliated Alan Guttmacher Institute. It is most obvious that the study fails to shed any light on the question before us today: <u>*Will Indiana's abortion statute cause a decline in abortion rates in Indiana? The answer is "no," for the study is riddled with flaws and biases, one of the most serious being its failure to account for the effects that will result from the substantive differences between the scope of the "medical emergency" exception in the state of Mississippi's statute as contrasted with the state of Indiana's statute. Thus, it is logically impossible to draw upon the study of Mississippi's legislation when predicting the future effects of Indiana's legislation*</u>.

## A.

I initially reject the notion that we must defer to the JAMA study because, according to the dissenting judge, the study "*meets any conceivable standard for peer-review*" and was published in "*one of the most highly respected journals in the medical field.*" *Post* at 56. A party proffering expert testimony must always establish that it is reliable and relevant to an understanding of the issue before the court, *Clark v. Takata Corp.*, 190 F.3d 750, 759 n.5 (7th Cir. 1999), and JAMA's peer review policy is no guarantee of reliability. As one commentator has noted, JAMA may send a manuscript out to as many as ten reviewers "but it may actually be reviewed by only three, two, or even one.

*Furthermore, an article may appear in print even if a majority of JAMA's reviewers recommends against publication, provided that the editor decides in its favor.*" D. Murray et al., *It Ain't Necessarily So* 151 (2001) (emphasis supplied). Moreover, the test for admissibility is not whether an article has been reviewed, or even well accepted, by one's peers. According to the Supreme Court: "*Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability, and in some instances well-grounded but innovative theories will not have been published. Some propositions, moreover, are too particular, too new, or of too limited interest to be published. . . . The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, but not dispositive, consideration in assessing the scientific validity of a particular technique or methodology in which an opinion is premised*." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 593-94 (1993) (emphasis added). *See also* L. Noah, *Sanctifying Scientific Peer Review*, 59 U. Pitt. L. Rev. 677, 698 (1998) ("At best . . . editorial peer review manages to filter out obviously sloppy work.").

Caution regarding the value of "*peer review*" as a judicial gatekeeper is particularly important in the case of *an abortion-related study published in JAMA*. *George D. Lundberg*, the editor at the time of publication of the 1997 study relied upon by the plaintiffs in this case, *has publicly stated that abortion is "a religious issue" which should be decided solely by the woman "after consultation with the father (if possible), members of her family, perhaps a religious adviser, and the woman's physician*." G.D. Lundberg, *JAMA, Abortion and Editorial Responsibility*, 280 JAMA 740, 740 (Aug. 26, 1998). *Lundberg went on to assert that the abortion decision is "not the business of police, lawyers, courts, the U.S. Department of Health and Human Services, the Congress of the United States, various state legislatures, or anybody else except the individuals*

*named above*." *Id.* The executive vice president of the American Medical Association, an organization which at one time was considered to be the voice of the vast majority of physicians and surgeons practicing in this nation, stated that Lundberg was terminated for "*inappropriately and inexcusably interjecting JAMA into a major political debate that has nothing to do with science or medicine*" by choosing to publish a study on how college students defined "*having sex*" in the midst of President Clinton's impeachment proceedings. *See* D. Ballingrud, *AMA Chief Defends Editor's Firing,* St. Petersburg (Fla.) Times, Feb. 23, 1999, at 3B. Relying on these facts, *it is apparent that this JAMA study must be viewed with a jaundiced eye, for it was written by a statistician and published by an editor who are outspoken supporters of "abortion on demand,"*[1] and thus cannot reasonably be classified as impartial and without prejudice or bias.

_____

[1] Moreover, it is worth noting that more than one JAMA article has exhibited hostility towards informed consent legislation in general. Indeed, a JAMA study published August 14, 2002 concluded that "requiring parental notification for obtaining prescribed contraceptives would impede adolescent girls' use of contraceptive services and their willingness to seek screening and treatment for sexually transmitted diseases." *Girls Surveyed on Sexual-Health Services*, Wall St. J., Aug. 14, 2002, at D2. Many critics declared that the parental notice study had obvious flaws, for the author inexplicably failed to interview a representative sample of the teenage population and *relied instead only upon responses from teenagers who were visiting Planned Parenthood clinics in Wisconsin*. According to one critic, the study showed only that "the types of kids who fool around don't tell their parents about it. That's not surprising." Kawanza L. Griffin, *Girls Would Shun Sex Health Care*, Milw. J. Sentinel, Aug. 14, 2002, at 1A.

**B.**

Moreover, the faulty JAMA article cannot be utilized to serve as a reliable, trustworthy, and independent basis for predicting the effects of the Indiana legislation for the additional reason that neither the article nor anything else in this record accounted for the fact that a greater number of Indiana women with medical problems (as compared to similarly situated women in Mississippi) will avoid the burdens of Indiana's notice-and-waiting provisions by qualifying for the state's "medical emergency" exception. The trial judge concluded that the number of Indiana women who will find themselves unable to obtain abortions as a result of the notice-and-waiting provisions will be equivalent to the number of women in Mississippi who supposedly are foreclosed from having an abortion— approximately 10 percent of the relevant population. *See* 132 F. Supp. 2d at 1175. However, as is evident from even a cursory reading of the statute, the exceptions to the notice-and-waiting requirements are far more broad in scope and more inclusive in Indiana than they are in Mississippi. As a result, even after attempting to accept the trial judge's notion that properly performed regression analyses have accounted for all other differences between the female population in Indiana and Mississippi, *id.* at 1163-71, the breadth of the Indiana exception will *obviously result in a greater number of Indiana women being excused from the statute's requirements, and thus a lesser number of Indiana women will be burdened by Indiana's requirements than the requirements in Mississippi*.

The Supreme Court of Indiana in its decision broadly defines the term "medical emergency" *as any physical or mental condition that is more severe and prolonged than those "lesser and regular conditions normally associated with pregnancy*," *A Woman's Choice v. Newman*, 671 N.E.2d 104, 109 (Ind. 1996), while the Mississippi legislature

has narrowly defined "*medical emergency*" as "*that condition which, on the basis of the physician's best clinical judgment, so complicates a pregnancy as to necessitate an immediate abortion to avert the death of the mother or for which a twenty-four-hour delay will create grave peril of immediate and irreversible loss of major bodily function.*" Miss. Code Ann. § 41-41-31(b). In Indiana, an abortion clinic may disregard the notice-and-waiting requirements if "*the attending physician, in the exercise of her clinical judgment in light of all factors relevant to a woman's life or health, concludes in good faith that medical complications in her patient's pregnancy indicate the necessity of treatment by therapeutic abortion*" without delay. *Newman, supra* at 111. On the other hand, in Mississippi at the time of the 1997 JAMA study, an abortion clinic was allowed to waive the notice-and-waiting requirement only in "*medical emergencies to avoid the death of the woman or prevent peril of immediate or irreversible loss of major bodily functions.*" *Pro-Choice Miss. v. Fordice*, 716 So. 2d 645, 656 (Miss. 1998). *See also Utah Women's Clinic Inc. v. Leavitt*, 844 F. Supp. 1482, 1491-93 (D. Utah 1994) (similarly interpreting Utah Code Ann. § 76-7-301(2)). *Cf. Stenberg v. Carhart*, 530 U.S. 914, 938 (2000).

As we have pointed out above, because the statutory exception is much more expansive in Indiana than Mississippi, a greater number of Indiana women will be exempt from the limitation of their statute than similarly situated women in Mississippi, and thus I cannot agree that evidence of a 10 percent reduction in Mississippi's abortion rate predicts that a similar reduction is on the horizon in Indiana.

*I cannot understand the dissent's attempt to enlarge the scope of Indiana's medical emergency exception* by claiming that "*the majority acknowledges [that] Indiana's law has been construed to have an emergency by-pass provision that covers any kind of physical or psychological risk to the*

*woman from any of its provisions, including presumably the 'presence' requirement.*" *Post* at 47, n.2. In doing this, the dissent has *mischaracterized the majority opinion as well as the Indiana Supreme Court's construction of the statute before us*. We in the majority, when stating that Indiana's emergency bypass has been "*held to encompass any kind of threat to the woman's health or safety*," *ante* at 14, are referring to the Indiana Supreme Court's statement that the "*medical emergency exception excuses a woman from the informed consent requirement when there is a significant threat to her life or health, physical and mental*" but that "*severe-but-temporary conditions in which an abortion is not the medically necessary treatment are not covered by the exception*." *Newman*, 671 N.E.2d at 111. "*Federal courts must interpret a state statute as that state's courts would construe it.*" *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998). In light of *Newman*'s interpretation of the emergency bypass provision, I disagree with the dissent's misinterpretation of the legislature's intent wherein it asserts that the bypass shall apply in situations when the alleged emergency determination is triggered by simple compliance with the 18-hour notice-and-waiting provisions, which will in turn expose the woman to either: (1) a temporarily greater risk of harm from an abusive parent, spouse, or partner; or (2) a temporary period of emotional distress, mental anguish, or trauma. *See Newman*, *supra* at 108-11.

Furthermore, even if I were to ignore the decision of the Indiana Supreme Court and the many methodological flaws within the JAMA study, it is evident that the very language of the study *disproves* the theory that the effects of Indiana's abortion law will be the same as Mississippi's, for the *study's authors admit on the final page of their study that the burdensome effects of abortion legislation "may be greater in states that have relatively fewer abortion providers" (Mississippi) than in other states (Indiana)*. According to the authors:

> The availability of abortion providers is also impor-
> tant to consider. The effect of mandatory delay stat-
> utes necessitating 2 visits to a provider may be great-
> er in states that have relatively few abortion providers.
> In Mississippi, there were only 8 abortion providers
> in the entire state in 1992 or 1.3 providers per 100,000
> women aged 15 to 44 years. . . . [T]he large decline in
> abortion rates we observed in Mississippi may not oc-
> cur in states with greater availability of abortion pro-
> viders both within the state and among neighboring
> states.

(Ex. 224 at 658.) The undisputed evidence in this record
establishes that: (1) Indiana has eleven more abortion
clinics than Mississippi; (2) Indiana women have much
easier access to clinics in nearby states than Mississippi
women; and (3) Indiana women, on average, live closer
to abortion clinics than Mississippi women.[2] More than
99 percent of Indiana women—but only 85 percent of
Mississippi women—live within 100 miles of an abortion
clinic.[3] (Tr. 67-72). Thus, even if we were to accept the
JAMA study at face value, we would be forced to accept the
fact that Indiana's law will be far less burdensome than
Mississippi's.

Providing neither support nor an analysis for his ruling,
the district judge found that "the Mississippi results did

---

[2] The record establishes that in 1992 there were 19 abortion
providers in Indiana, or 1.44 providers per 100,000 women aged
15 to 44 years. (Ex. 221).

[3] The demographics of Utah also are quite different from Indi-
ana's. More than 95 percent of Utah's abortions are performed
in Salt Lake City. Only two abortion providers are located outside
of Salt Lake City, and nearly all women living outside of the Salt
Lake City area live more than 100 miles from an abortion clinic.
(Tr. 70-72).

not correlate at all with distance or geography" and then
somehow concluded that the effects of Indiana's statute
"are likely to be equivalent to the effects of the similar
law in Mississippi." 132 F. Supp. 2d at 1175. The trial
judge's finding is beyond the realm of reasonable specula-
tion and may best be classified as unworthy of credence.
Comparing Indiana to Mississippi is like comparing a
turnip to a loaf of bread. As the majority observes, neither
the Mississippi study nor any other evidence cited by the
plaintiffs establishes that the population and demographics
of Mississippi and Indiana are similar in terms of "urban-
ization, income, average distance from an abortion clinic,
[or the] average price of abortion." *Ante* at 11. Nor is there
evidence of similarity between Mississippi and Indiana in
terms of their availability of social support services, at-
titudes towards abortion, respective success with adoption
and abortion alternative programs, or countless other
factors that might allow us to equate the two states with
any degree of confidence.[4]

The dissent spends several pages arguing the proposi-
tion that "[o]nly by ignoring key points such as the num-
ber of women" in Mississippi "who willingly undertook
the burden of seeking an abortion out-of-state, where
they could have the entire procedure accomplished in one
visit, rather than staying in-state and enduring the two-
visit burden, can the majority come to the result it does."
*Post* at 61. The dissenting judge ignores the key fact

---

[4] Mississippi, for example, consistently ranks among the lowest
states in the nation in terms of government funding for public
schools (48th in 2000). As a result of this lack of funding, products
of these schools obviously cannot be as well prepared as their
sisters in Indiana to throughly understand and operate the type
of electronic maze of telephonic options (as the district court
suggests), particularly when the decision is joined with the life
or death decision.

that nothing in this record answers the critical question of *why* some Mississippi women left the state to abort their pregnancy. A woman might very well think twice about her momentous decision if she believed that her identity were to become known within her local community. On the other hand, we are cognizant of the fact that even a small increase in the cost might dissuade an already vacillating woman living near the poverty level. Since nothing in this record distinguishes "between those incidental effects [*e.g.*, slightly increased cost or time delay] of the statute which make the right to choose more inconvenient or costly and those direct effects which actually prevent women from obtaining an abortion," *Eubanks v. Schmidt*, 126 F. Supp. 2d 451, 457 (W.D. Ky. 2000), it is impossible to know whether "the waiting period, as opposed to some other factor or factors, caused the negative abortion trend in Mississippi." *Karlin v. Foust*, 188 F.3d 446, 488 (7th Cir. 1999). It also is impossible to come to a well-reasoned and logical conclusion based on the record before us whether the laws of the state of Indiana will have a similar impact as Mississippi's laws. *See id.*

For the reasons set forth above, it is apparent that the district court's reliance upon the Mississippi data (the Henshaw study) to predict the effects of materially different legislation in Indiana (notice-and-waiting) piles a mountain of speculation upon a foundation of quicksand. I am convinced that the district judge erred when he relied on the biased JAMA study when searching for a way to enjoin Indiana's abortion-control statute. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 144-45 (1997) (expert studies based on data that was "*so dissimilar to the facts presented in this litigation*" were irrelevant and inadmissible); *Daubert*, 509 U.S. at 591-92 (expert studies that fail to establish "a valid scientific connection to the pertinent inquiry" before the court are irrelevant and inadmissible).

## II.

## A.

Even if the plaintiffs had somehow been able to produce reliable evidence in support of the trial judge's belief that Indiana's abortion rates will decline 10 to 13 percent as a result of the state's informed consent laws, Indiana's statute would still pass constitutional scrutiny, for a law enacted that seeks to promote a legitimate state interest will be deemed valid unless, "in *a large fraction* of the cases in which the law is relevant, it will operate as a substantial obstacle to a woman's choice to undergo abortion." *Casey*, 505 U.S. at 895 (emphasis supplied). Accordingly, I write separately to explain my disagreement with the dissent's contention that "we would still be required to enjoin" Indiana's statute even if it blocked a much smaller percentage of Indiana women—"'only' 1%" of the population—from exercising their "right to choose." *Post* at 46.

In determining whether Indiana's notice-and-waiting provisions are lawful, we must inquire whether women in Indiana seeking abortions, who are unable to qualify for any of the numerous exceptions to the law, will bear added costs and inconveniences from complying with the notice-and-waiting provision that are so burdensome that they will have the direct effect of preventing a "large fraction" of those women from obtaining abortions. *See Casey*, 505 U.S. at 894-95; *Eubanks*, 126 F. Supp. 2d at 456. I am of the opinion that the dissenting judge misinterprets *Casey* when she argues that "*Casey made it clear*" that "*we would still be required to enjoin [Indiana's statute] if it affected 'only' 1%, the number presumptively affected by the spousal notification rule in Pennsylvania.*" *Post* at 53, 46. The *Casey* Court stated that it was enjoining Pennsylvania's spousal notification law because a "large fraction" or a "significant number" *of a subgroup of the one percent of women* who feared complying with the law

were "likely to be deterred from procuring an abortion"—not because the law imposed some insubstantial burdens upon one percent of women in the state. *Casey*, 505 U.S. at 894-95.

According to the Court:

> The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant. . . . Of course, as we have said [the Pennsylvania statute's] real target . . . is married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement. The unfortunate yet persisting conditions we document above will mean that in *a large fraction* of the cases in which [the statute] is relevant, it will operate as *a substantial obstacle* to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid.

*Id.* (emphasis supplied). In other words, *Casey* held that Pennsylvania's law was invalid not because it imposed additional burdens upon one percent of the state's women but rather because it effectively prevented *a "large fraction" of women within that group of one percent of women* from obtaining abortions altogether. *See id.* at 895.

The *Casey* plurality did not explain, and thus we refuse to peer into the dark abyss of speculation in an attempt to determine at precisely what point a fractional part of a group becomes an impermissibly "large fraction" and a statute becomes unduly burdensome. "To the extent I can discern *any* meaningful content in the 'undue burden' standard as applied in the joint opinion, it appears to

be that a State may not regulate abortion in such a way as to reduce significantly its incidence." *Id.* at 992 (Scalia, J., dissenting). However, even assuming in the case before us that some number of women will be burdened by the law, it is clear that a law which incidentally prevents "some" women from obtaining abortions passes constitutional muster. Indeed, *Casey* upheld a parental notification law despite the district judge's undisputed finding that, in "some" of the 46 percent of cases where a minor can neither obtain the requisite consent of a parent nor avail herself of the judicial bypass provisions, the law "may act in such a way as to deprive [the minor] of her right to have an abortion." *Planned Parenthood v. Casey*, 744 F. Supp. 1323, 1356-57 (E.D. Pa. 1990) (factual findings 237 and 255). Though the requirement was likely to prevent "some" minors from exercising their right to choose, the Court refused to interfere and ruled that "the one-parent consent requirement and judicial bypass procedure are constitutional." *Casey*, 505 U.S. at 899.

The dissenting judge pushes the envelope and expounds a new theory of law without the citation of case law upholding the premise that a statute is unconstitutional if it prevents *even one percent of the relevant population* from obtaining an abortion, *post* at 53, and stretches the notion of substantive due process beyond reasonable limits. Were we to accept the dissent's argument, we believe the Supreme Court would have found Pennsylvania's parental consent statute to be unduly burdensome. But the Court chose not to strike down the Pennsylvania statute, and I believe it defies logic to argue that one percent of any group is a "large fraction" of that group. In light of the Justices' repeated use of words such as "a significant number of women," and "many women"; its estimate that millions of women would be burdened by a spousal notice law; and the most *informative comments* of Justice Stevens and Justice Scalia that *restrictions*

*are impermissible only if they are "severe," id.* at 920, *and lead to "significant" reductions in abortion rates, id.* at 992, I am of the opinion that the challenged legislation before us is constitutional, even though, as the majority observes, the district court concluded that "the statute . . . raises the cost (both financial and mental) of an abortion," *ante* at 2, and "will reduce by 10% to 13% the number of abortions performed in Indiana." *See Memphis Planned Parenthood*, 175 F.3d at 462-63. *Cf. Okpalobi v. Foster*, 190 F.3d 337, 354 (5th Cir. 1999).

**B.**

My belief is further supported by *Casey*'s forceful statements distinguishing between the constitutionality of mandatory informed consent laws (which are lawful) and mandatory spousal notification laws (which are not). Although under *Casey*, states may not enact spousal notification laws embodying views that are "repugnant to our present understanding of marriage and of the nature of the rights secured by the Constitution,"[5] *Casey*, 505 U.S. at 898, "it does not at all follow that the State is prohibited from taking steps to ensure that [the choice to end a pregnancy] is thoughtful and informed." *Id.* at

---

[5] Although the *Casey* plurality dismissed the father's interests in the life of his unborn child, it is important to note that the four dissenting Justices were of the opinion that the state "has legitimate interests both in protecting the interests of the father and in protecting the potential life of the fetus, and the spousal notification requirement is reasonably related to advancing those state interests." *Casey*, 505 U.S. at 974 (Rehnquist, C.J., dissenting in relevant part). "By providing that a husband will usually know of his spouse's intent to have an abortion, the provision makes it more likely that the husband will participate in deciding the fate of his unborn child, a possibility that might otherwise have been denied him." *Id.*

872. It is incumbent upon the federal judiciary to respect basic principles of federalism and give considerable deference to a state legislature's carefully reasoned decision to "enact rules and regulations designed to encourage [the woman] to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself." *Id.*

This record reflects that the Indiana General Assembly held a full panoply of hearings, engaged in extended floor debates, and considered numerous amendments offered by legislators prior to enacting the informed consent law before us today. Absent a clear constitutional violation, neither a federal district court nor an appellate court should ever take it upon itself to strike down legislation merely because it disagrees with the legislation enacted by democratically elected state representatives. Informed consent laws, having notice-and-waiting periods like Indiana's, should thus be upheld, for the Supreme Court has held that the "idea that important decisions will be more informed and deliberate *if they follow some period of reflection does not strike us as unreasonable*, particularly where the statute directs that important information become part of the background of the decision" *concerning the life or death of the child. Casey*, 505 U.S. at 885 (emphasis supplied). *See also Planned Parenthood v. Danforth*, 428 U.S. 52, 67 (1976).

The Indiana General Assembly enacted its notice-and-waiting statute in an effort to alleviate a widespread problem. Witnesses at legislative hearings reported that literally hundreds of Indiana women were suffering serious regret and long-term physical, emotional, and psychological damage as a result of their choice to terminate

their pregnancies without being properly informed about the risks, complications, and alternatives to the procedure. *A Woman's Choice v. Newman*, 904 F. Supp. 1434, 1449 (S.D. Ind. 1995).[6] The intent of the legislature, according to the Supreme Court of Indiana, was to reduce the risk of abortion by "ensur[ing] that women receive the best information available" regarding the moral, social, psychological, and medical issues relevant to deciding whether to undergo the procedure. *Newman*, 671 N.E.2d at 111.

Included in the information that must be provided to the patient is: (1) the name of the abortionist; (2) the nature of the proposed procedure; (3) the risks and alternatives to the procedure; (4) the probable gestational age of the fetus; (4) the existence of medical assistance benefits and abortion alternatives; and (5) the father's legal responsibility to assist in the support of the child if the child is carried to term. Ind. Code §16-34-2-1.1. I am convinced that the Indiana General Assembly has made a reasonable and lawful decision when enacting this informed consent bill in an effort to ensure that the woman's choice regarding the life or death of her child has been both knowingly and voluntarily made, after extended debate and careful reflection.

---

[6] The risk of suicide for women who have abortions is both serious and real, if often under reported. *See* B. Garfinkel et al., *Stress, Depression and Suicide: A Study of Adolescents in Minnesota* (1986) (finding that a teenage girl in Minnesota was *ten* times more likely to attempt suicide if she had undergone an abortion in the previous six months than a comparable girl who had not had an abortion); *Suicides After Pregnancy in Finland, 1987-94: Register Linkage Study,* 313 British Med. J. 1431-34 (Dec. 7, 1996) (concluding that Finnish women who had induced abortions had a suicide risk *three* times that of the general population and *six* times that of women who gave birth).

This legislation will assist women in understanding that abortion is an invasive procedure that may very well have painful psychological, physical, and moral consequences. The woman undergoing the abortion may very well experience serious psychological disorders and mental health problems in the form of depressive psychosis (including the risk of suicide) both before, during, and for many years following her decision—perhaps even for a lifetime. Added to this mental strain and anguish are the almost endless number of physical risks involved, including trauma, permanent damage to reproductive and other vital organs, dysfunction of the cardiovascular or respiratory system, internal bleeding or hemorrhaging, embolism, and allergic reactions. Other medical factors to be considered in making a mature, informed decision include the type of abortion to be performed, the woman's past medical and psychological history, her physical reaction to previous medical procedures, her tolerance for certain medications, the likelihood of contracting a uterine infection, the chance that the placenta and fetus will not be completely removed, the potential for future difficulties in bearing children, and even the possibility of sexual sterility. *See Zbaraz*, 763 F.2d at 1549-50 (Coffey, J., dissenting).

The Indiana statute requires that the name of the abortionist be made known to the patient, thus giving her an opportunity to review the credentials, qualifications, and experience of the physician, inquiring into whether he is a board-certified gynecologist, is accurate in his pregnancy term diagnosis, and is familiar with both the procedure and the myriad complications that may very well arise during the procedure. *See id.* at 1550. In making this decision, she is entitled to know whether the abortion procedure is being performed by "a well-trained, qualified surgeon or simply a second-rate surgeon who entered the abortion practice because he was denied hos-

pital staff privileges by a medical peer review committee after questionable medical procedures or inferior surgical technique." *Id.* at 1552. Such information is essential to making a responsible decision.

The woman also will receive information regarding economic issues, such as the father's obligation to contribute to the support of the child, the availability of medical benefits and child care, and the right and possibility of giving up the baby to a loving adoptive family. After receiving such information, it also is probable that the best interests of the client would be better served were she to be granted a reasonable period of time to reflect upon the information recently made known to her dealing with the possible social and psychological problems arising from the decision. Hopefully, the medical professionals who meet with the woman will be well-trained in order that they might prepare the patient to confront and resolve the possible feelings of anger, fear, depression, and confusion she may encounter towards herself and/or the father, the onset of guilt and overall withdrawal from society, and the all too frequent threat of the taking of one's own life. *See id.* at 1550; *ante* at 34, n.6.

It also is reasonable for a state legislature to have believed that the most efficient way to safeguard the health, safety, and well-being of the pregnant woman would be to allow her to receive the above-stated information during a face-to-face meeting with medical professionals. It was most unfortunate and inappropriate for the court to accept the proposition that voluntary consent for an abortion may be insured by a patient dialing an 800-phone number, touching certain digits on her keypad, and then passively taking in information through the telephone. *See* 904 F. Supp. at 1452.

Only a direct, face-to-face meeting will serve to allow the patient and the doctor to have a full and complete

understanding of the possible problems that might arise during or after the invasive procedure. This—and only this—type of meeting is the way to determine whether the client is giving an informed consent or is conveying a wish to postpone the procedure. Personal contact is vital to any question of informed consent, for it allows the medical expert the best opportunity to observe the verbal and nonverbal behavior of the patient by focusing on her reactions and responses to questions, her facial expressions, attitude, tone of voice, eye contact, posture and body movements, confused or nervous speech patterns and countless other factors that are indiscernible by telephone but may reveal incongruities between what the patient says and what she actually feels or believes. *Cf. United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002); *United States v. Mancillas*, 183 F.3d 682, 701 n.22 (7th Cir. 1999).

As a result, a face-to-face consultation occurring a reasonable time before the abortion "may disclose what a telephone interview will mask: whether a woman is apprehensive, uncertain, or equivocal about whether to have an abortion; whether she needs or wishes some additional information; or whether she wishes, but may find it difficult, to ask some additional question or explore some other alternative."[7]

In the Indiana House of Representatives, the chief sponsor of this bill stated during extensive debates that it is important for women to receive this information *either in the presence of the abortionist or a well-schooled and -trained physician's assistant, licensed practice nurse, or midwife* because the patient might very well "want

---

[7] Brief *Amicus Curiae* of the United States Conference of Catholic Bishops and the Indiana Catholic Conference at 7-8 (internal citations and ellipsis omitted).

to talk personally to the person who may be performing" the procedure and would benefit from personal, face-to-face consultation instead of meeting the professional for the first time "on the operating table" and it is unclear whether "this is the doctor or the person you're supposed to be talking to." *Newman*, 904 F. Supp. at 1464-65.

Indeed, the need for an in-the-presence requirement was underscored by testimony at the preliminary injunction hearing, where a woman who had just recently undergone the procedure at an Indiana abortion clinic testified she never saw her doctor until he began the procedure, never saw his face (for it was covered with a surgical mask), and never learned his name because he never spoke with her. The woman testified as follows: *"[A female assisting nurse] said, "'This is your doctor,' and I said, 'Does my doctor have a name?' And he giggled and she smiled, but I don't know who he was. And he did the procedure. He never talked to me. He talked to her. They talked about something, I can't even remember, and it was over. And he left."* (Tr. 416-17).

Some of the materials that the General Assembly directed the abortionist to provide to the woman, in order that she might be properly informed before making one of the most important decisions of her entire life and to minimize as best as possible the potential for future physical or psychological injuries, cannot be accurately or easily conveyed through other media, as the district judge's injunction requires. The General Assembly was of the opinion that it is essential for the woman to be well-informed among other things, of the "probable gestational age of the fetus" and also be given the option of seeing a picture or drawing of the fetus and its dimensions. Ind. Code § 16-34-2-1.1(1). It is nigh unto impossible to provide a picture or drawing of a pre-born child over the telephone unless both the patient and the abortion clinic are equipped with expensive, highly advanced videoconferencing equip-

ment. Furthermore, any attempt to provide an illustration through the mail without having first met with the patient for a physical examination may potentially be misleading and inaccurate. The district judge's refusal to enforce Indiana's requirement of face-to-face meetings between the health care provider and the pregnant woman emasculates the statute and undermines the very intent of the legislature.

In my opinion, it was an abuse of discretion for the district judge to disregard controlling legal authority, cast aside the opinions of qualified medical experts and the judgment of the people of Indiana as represented by the elected members of the Indiana General Assembly, and declare that the "in the presence" requirement is not "reasonably likely to provide any genuine benefit" to Indiana women. *Newman*, 904 F. Supp. at 1465. Not many judges are versed in the nuances of the practices and techniques of the medical profession. Thus, the judiciary is "ill-equipped to substitute [its] views regarding what is medically adequate, proper, or antiseptic" for those of the legislature, which acts with the full benefit of evidence received through hearings, debates, and meetings with the people of the state. *Ragsdale*, 841 F.2d at 1389 (Coffey, J., dissenting).

The trial judge's questionably reasoned *ipse dixit*, pronounced without the support of even one citation to the record, invades the legitimate province of the legislative and executive branches and places a straitjacket upon their power to regulate and control abortion practice. As a result, literally thousands of Indiana women have undergone abortions since 1995 without having had the benefit of receiving the necessary information to ensure that their momentous choice is premised upon the wealth of information available to make a well-informed and educated life-or-death decision. I remain convinced that the trial judge abused his discretion when depriving the sovereign

State of Indiana of its lawful right to enforce the statute before us. I can only hope that the number of women in Indiana who may have been harmed by the judge's decision is but few in number.

## III.

In Indiana, according to the preamble to its abortion control statute, "*[c]hild birth is preferred, encouraged, and accepted over abortion.*" Ind. Code § 16-34-1-1. Furthermore, "in America, we respect the sanctity of human life." *Walsh v. Mellas*, 837 F.2d 789, 798 (7th Cir. 1988). Pro-life legislation that fails to pose a substantial obstacle for 87 to 90 percent of a state's women, and may have the incidental effect of reducing the demand for abortions by merely 10 to 13 percent, is reasonable, sensible, and lawful under the Constitution of the United States and the State of Indiana. Because this is the thrust of Judge Easterbrook's reasoning, I am pleased to join his opinion.

DIANE P. WOOD, *Circuit Judge*, dissenting. In today's opinion, the majority disregards the standards that were established by the Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), for evaluating laws that impose burdens on a woman's right to seek an abortion, and it brushes aside the painstakingly careful findings of fact the district court made in support of the limited preliminary injunction it issued against Indiana's so-called informed consent law, Ind. Code § 16-34-2-1.1. The careful reader of the majority's opinion will see that the majority regrets the fact that the Supreme Court held in *Stenberg v. Carhart*, 530

U.S. 914 (2000), that pre-enforcement challenges of abortion statutes, like the one presently before us, are permissible. Nevertheless, *Stenberg* is the law of the land and we must follow its direction, including its endorsement of the constitutional standards governing abortion legislation first articulated by the *Casey* plurality. See *Stenberg,* 530 U.S. at 921. That direction is by no means the opaque mess the majority accuses the Supreme Court of creating. In my view, the Court has not left us with "irreconcilable directives" nor has it put courts of appeals "in a pickle." *Ante* at 7. At the most, if we were reviewing legislation in some field unrelated to abortion (or speech), we might be faced with the problems the majority describes. As for abortion regulation, the Court's guidance is crystal clear. In the end, the majority concedes that *Stenberg* governs, which ought to be enough for present purposes to lead to an affirmance of the district court's grant of the injunction.

When one follows the analytical path outlined in *Casey*, it becomes clear that the district court did not abuse its discretion when it concluded that one narrow requirement of Indiana's law had to be enjoined. In support of that conclusion, the court found that in the particular circumstances faced by Indiana women, and on the basis of the expanded factual record that the Supreme Court invited in *Casey*, the law's requirement that women receive certain advice "in the presence" of "the physician who is to perform the abortion, the referring physician or a physician assistant" (§ 16-34-2-1.1(1)) amounts to an unconstitutional "undue burden" on the abortion decision. I would affirm the district court's decision.

Before turning to the areas of disagreement that lie between the majority and me, it is important to point out that we also share some areas of agreement. First, it is clear that Indiana's requirement to furnish the statutory information "in the presence of the pregnant woman"

(instead of, for example, mailing written materials, having a telephone conversation, or visiting a local doctor who is neither the referring physician nor the physician who will perform the procedure) is one that raises the cost of obtaining an abortion. This is because the "presence" rule normally necessitates two trips to the abortion facility.

Second, the majority notes, and I agree, that there are both unconstitutional ways in which costs may be raised and constitutional ones: an increased cost is unconstitutional if it is has the purpose or effect of *forcing* some women to give up their constitutional right to choose abortion; it is constitutional if it genuinely furthers the state's legitimate interest in *persuading* women not to select abortion when faced with an unwanted pregnancy.

Third, I agree with the majority that the standard of review for constitutional or legislative facts is more searching than the one we use for historical facts. That does not mean, however, that we may disregard the district court's findings of historical fact. To the contrary, the Supreme Court has emphasized that we owe deference to such findings even in constitutional cases. See *Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers"). Were we to abandon that rule, many constitutional matters would receive far less restrained review than we presently give them: from possible violations of the Fourth Amendment, to the voluntariness of confessions, to the First Amendment protection accorded to public employee speech.

**I**

Turning now to the way in which we should resolve this appeal, it is useful to begin with some reminders

about what *Casey* held. (For ease of exposition, I refer to *Casey* alone rather than to "the *Casey* standard as endorsed in *Stenberg*," since the latter formulation, while more accurate, is needlessly cumbersome.) First, *Casey* dictates how to draw the line between permissible state regulation and unconstitutional regulation:

> Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

505 U.S. at 874. The opinion later elaborates on the undue burden standard:

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Id.* at 877.

Applying this standard, the Court struck down the Pennsylvania statute's spousal consent requirement and the record-keeping requirement relating to spousal notice; it upheld the statute's parental consent requirement (which contained the necessary one-parent and judicial bypass provisions), the medical emergency provisions, the rest of the record-keeping requirements, and the "informed consent" requirement. Knowing both what failed the new test and what passed it gives litigants a roadmap of the kind of claims that are likely to succeed, and the kind of evidence they must present. It also gives us concrete guidance on the critical questions now before us: (1) under the *Casey* test, must the statute create an "undue burden" for every single woman, or is it enough that it create an undue burden for some women; (2) to what extent are we dealing with empirical, fact-specific issues, and to what extent with "legislative" issues; and (3) how must the statute allow for flexible compliance with the state's broader goals?

The first question—how many women must be affected—is really another way of putting the question about facial challenges that the majority addresses. *Ante* at 7. In this connection, despite its disclaimers, one is left with the strong impression that the majority is applying either *United States v. Salerno*, 481 U.S. 739 (1987), or something very close to it. In essence, it holds that a state statute like the one before us now would be unconstitutional only if there was "no set of circumstances" under which it was valid—by which it seems to mean that not a single woman in Indiana would find the law's burdens tolerable. This is an impermissible back-door application of *Salerno*. Worse yet, it assumes the answer to the question before us: whether the system Indiana wants to put in place will unduly burden Indiana women. Since the pertinent part of the statute has never gone into force, the majority indulges in the presumption that

the law imposes no burden at all. But this presumption is found nowhere in our jurisprudence, at least for laws implicating fundamental constitutional rights. Furthermore, this methodology is inconsistent with *Casey*.

Part V–C of *Casey* addressed the spousal notification requirement of the Pennsylvania law, also under circumstances in which enforcement had not yet begun. The district court had found, and the Supreme Court accepted, that "[t]he vast majority of women consult their husbands prior to deciding to terminate their pregnancy. . . ." 505 U.S. at 888. We can assume, therefore, that the spousal notification requirement was not an undue burden, or any kind of burden, for that "vast majority" of women; they are already doing what the statute specified. But the Court went on to consider the plight of women who were not already consulting the putative father: the 2,000,000 women a year who are the victims of severe assaults by their male partners. As for *those* women—"the victims of regular physical and psychological abuse at the hands of their husbands," *id.* at 893, matters were different. The Court found, based on "[t]he limited research that has been conducted with respect to notifying one's husband about an abortion, although involving samples too small to be representative," *id.* at 892, that the spousal notification requirement was "likely to prevent a significant number of women from obtaining an abortion." *Id.* at 893. Later, to underscore the point, it reiterated that "[t]he analysis does not end with the one percent of women upon whom the statute operates; it begins there." *Id.* at 894.

That takes us to the second critical question: whether the reduction in abortions performed is the result of the law's persuasive force or the consequence of the impermissible placement of obstacles in the path of a woman's right to choose. One may assume, for the sake of argument, that fewer women in Indiana will forego an abor-

tion than did women in Mississippi, according to the studies in the record. One may further assume that a larger percentage of women in Indiana who forego an abortion will do so because they were persuaded by the law's informational requirements, contrary to their sisters in Mississippi. No matter: under *Casey*, our focus must be on those women who, like those affected by the spousal notification requirement in Pennsylvania, will forego the abortion because of the burden, and not because of persuasion.[1]

I cannot imagine a more resounding repudiation of the *Salerno* approach than the *Casey* opinion gave. The majority opinion in *Stenberg* makes it clear that this was no accident or oversight. We must therefore look at the effect of the "in the presence" requirements on the Indiana women upon whom the statute operates: the approximately 10% (as the record suggests and as the district court found) who will no longer be able to obtain abortions under the new regime. (Note that the 10% number could be off by an order of magnitude and we would still be required to enjoin this part of the law if it affected "only" 1%, the number presumptively affected by the spousal notification rule in Pennsylvania.)

---

[1] In fact, the parallel with the spousal notification requirement in *Casey* runs deeper than the mere finding of an undue burden. Were the Supreme Court to have reasoned along the same lines as the majority of the panel, it would have concluded that the 1% of women who forego abortions because of the notification requirement have in fact merely changed their minds—been "persuaded"—after the consultation with their husbands that would not have occurred but for the notification requirement. The Court focused on those women who were *not* persuaded, but who instead were forced to carry their pregnancy to term because of the risk of violence or abuse from their male partner. Similarly, this court should focus on those who are not persuaded because of the "presence" requirement, but for whom this requirement is close to the equivalent of a flat prohibition on abortion.

But, the majority responds, the Supreme Court in *Casey* upheld something almost exactly like the Indiana "in the presence" requirement when it found that Pennsylvania's informed consent rules passed muster. Informed consent at the most general level, of course, was not the issue either in our case or in *Casey*; under the injunction the district court entered, every Indiana woman is furnished with the information the state deems helpful, and when she shows up for the abortion procedure the doctor can once again assure herself that the patient's consent is informed. Our concern is with the specific way in which the state wants the information to be transmitted.[2]

The majority suggests that *Casey* has already answered this question, insofar as it addressed a regulatory regime with a similar "two visit" rule. But a look at the *Casey* opinion shows that the Court was not writing so broadly; to the contrary, the Court took great pains *not* to rule on informed consent/two-visit rules either in general as a matter of fact or as a matter of law. Instead, it explicitly limited its holding to the record before it. It stated that

---

[2] As the majority acknowledges, Indiana's law has been construed to have an emergency by-pass provision that covers any kind of physical or psychological risk to the woman from any of its provisions, including presumably the "presence" requirement. But that does not distinguish it from Pennsylvania's statute, which also relieved a physician of compliance with the informed consent rules "if he or she can demonstrate, by a preponderance of the evidence, that he or she reasonably believed that furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient." 18 Pa. Cons. Stat. § 3205(c) (1990). The existence of such a statute was not enough to convince the Court that the spousal consent requirement was permissible. By the same token, the existence of a similar safety valve in the Indiana statute is not enough to save the otherwise burdensome "presence" requirement, for the reasons I explain below.

there was "no evidence *on this record* that requiring a doctor to give the information as provided by the statute would amount *in practical terms* to a substantial obstacle to a woman seeking an abortion." *Id.* (emphasis added). There is no reason to treat the phrases "on this record" and "in practical terms" as casual insertions. The Court thought that the waiting period question was a close one, particularly because it would often translate into a two-visit requirement. The Pennsylvania district court had not made the necessary findings of fact to show that a two-visit requirement would amount to an undue burden (largely because that court had applied the old trimester test from *Roe v. Wade*, 410 U.S. 113 (1973), and had invalidated the rule for other, less factually sensitive, reasons). If there could be any doubt remaining on the question whether the Court was restricting its ruling to the record before it, the following passage from *Casey* should set it to rest:

> And the District Court did not conclude that the waiting period is such an obstacle even for the women who are most burdened by it. Hence, on the record before us, and in the context of this facial challenge, we are not convinced that the 24-hour waiting period constitutes an undue burden.

505 U.S. at 887.

*Casey*, therefore, establishes the following guidelines for the present case: (1) we must evaluate the Indiana law based on those upon whom it is operating, which is to say the set of women who will be burdened by the "in the presence" requirement; (2) if there were no evidence before the court tending to show that this requirement, like the spousal notification rule considered in *Casey*, is "likely to prevent a significant number of women from obtaining an abortion," 505 U.S. at 893, then we would be required to uphold Indiana's rule on this facial challenge; but

(3) since there is evidence that is at least as reliable—if not much more so—than the evidence on which the *Casey* opinion relied in evaluating the spousal notification rules, we must look at what that evidence shows, deferring to the district court's findings of historical fact, just as the Supreme Court did in *Casey. Cf. Ornelas*, 517 U.S. at 699. I now turn to the evidence before the district court.

## II

Initially, it is necessary briefly to consider what we mean by the term "fact" and how a fact may be established. The majority has tried to explain how and why it is reversing the district court, even while it accepts such critical findings of fact as (1) abortions dropped in Mississippi after enactment of a two-visit rule, as compared to those in South Carolina, which did not have a two-visit rule; and (2) the number of abortions performed in Indiana has not declined because of the advice given to women pursuant to the statute. Even though these facts support the district court's finding, the majority argues that the ultimate finding of an "undue burden" cannot be sustained, largely because the Supreme Court did not find such a burden in *Casey* for a similar rule, nor did this court in *Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999), the decision upon which the majority places most of its reliance. With respect, I believe this approach confuses two fundamentally different inquiries: the first concerns the way in which a certain fact must be established, and the second asks whether this fact will logically vary from case to case or if, once properly established, it is "legislative" in nature such that it cannot be questioned over and over again.

*Casey*, as the preceding discussion makes clear, was focused on the first of those questions. The Court there decided that the existence of an "undue burden" had not been established on the record then before it. It left the

door open, however, for later parties to present more evidence that would cure the gaps in the record that existed. This point can be illustrated by an analogy to new drug approval. Suppose a pharmaceutical company approaches the Food and Drug Administration with an application for approval of a new drug, Alpha. Naturally, it submits supporting information to the agency. If, however, the FDA deems that information insufficient, it will reject the application. This does not mean that the company cannot re-apply later, after it conducts more clinical studies or otherwise cures the deficiencies in the earlier record. Based on a fully supported application, the FDA will decide whether Alpha should be approved as safe and effective for the designated uses. Our situation is exactly the same. We now have in this case the "re-application" for a finding whether a rule that requires two visits to the clinic (here, Indiana's "presence" requirement) constitutes an undue burden. Are there, in other words, women for whom this rule has the "effect of placing a substantial obstacle in the path of . . . seeking an abortion of a nonviable fetus"? 505 U.S. at 877.

In order to answer that question, we must evaluate the evidence presented in this particular case. Before doing so, however, it is also useful to note where the concept of "legislative facts"—on which the majority relies—legitimately applies in this case, and where it does not. Skipping over the crucial question about the way in which facts must be established, the majority treats this case as one in which the factual record is identical to the record in *Karlin* and then assumes that if there was nothing unconstitutional about a two-visit rule in *Karlin* there can be nothing unconstitutional here. Burdens are burdens, no matter what state a court is considering. Furthermore, reasons the majority, that is how the Supreme Court treated efforts to regulate the late-term abortion procedure at issue in *Stenberg,* and thus it must be the way to treat all facts relating to the abortion issue.

With all due respect, the majority has failed to take into account significant differences in the record that was compiled in this case, as compared with the record before the *Karlin* court, and it has made assumptions about inter-state differences that are unsupported in this record (and, I suspect, unsupportable). Once again, I discuss the particular evidence in the present record later. What is important here is to recognize that this evidence is highly pertinent to the case. A central reason why the majority treats this as a "failure of proof" case, to the extent it does, is that it assumes that studies done in Mississippi, or Utah, or North Carolina, have nothing to do with Indiana. This assumption is mysterious. What we are considering, after all, is a simple matter of human reactions to sets of incentives or disincentives: will a particular measure be seen as a disincentive at all; if so, will the obstacle be a mere inconvenience, or will it effectively ban a particular option? In the field of economics, we assume that people will react in similar and predictable ways to incentives. (And sometimes it takes more than one study to ascertain what the incentive effects of a particular measure are, even if, once understood, those effects are presumed to be universal.) Consistently with that well-accepted proposition, there is every reason here to assume that Indiana women will react to proven incentives and disincentives in the same way women from other states (*e.g.*, Mississippi) have been shown to respond. The Law of Demand is based on generalized assumptions about human behavior and rationality, and there is no reason to waste time trying to prove that people in one area are exceptions to these rules. The Supreme Court relied on the same idea in *Stenberg*: faced with high uncertainty about which procedures were legal and which were not, coupled with draconian penalties for an incorrect guess, it was safe to assume that all doctors, everywhere, would err on the side of caution and refuse altogether to perform certain kinds of late-

term abortions. Maybe the Court should have carved out an exception for doctors in places famous for attracting gamblers, like Las Vegas or Atlantic City; but for obvious reasons it did not.

The majority acknowledges that under the Law of Demand, higher prices for abortion will decrease the number demanded, but (as it also appears to recognize) that is not the difficult question here. It is instead whether the observed increase in price caused by the "presence" or two-visit rule is a permissible one under the undue burden analysis. See *City of Los Angeles v. Alameda Books, Inc.*, ___ U.S. ___, 122 S.Ct. 1728, 1742 (2002) (Kennedy, J., concurring) (reduction in demand is merely the first step of an analysis on the permissibility of a regulation: the crucial step is whether that decrease was achieved through allowable governmental action). That is precisely the issue that the Court identified in *Casey* as an empirical point, where a different result was possible on a more complete record. It is unclear at best to me why the two judges in the majority on this panel think that they know better than the district court judge, who heard all the testimony and weighed all the evidence, what the answer is to the question whether a critical number of Indiana women would experience the "in the presence" rule as such a significant burden that it would effectively prevent them from exercising their constitutionally protected choice. Instead of respecting the district court's extensive work, the majority finds flaws with the evidence on which the court based its factual findings. It thinks, for instance, that the evidence in the record should have taken into account factors like degree of urbanization, average distance to abortion clinics, and income levels. *Ante* at 11.

But this simply leads to the majority's second misunderstanding about the legal significance of the differences between Mississippi and Indiana that these factors might reveal. At best, studies incorporating these variables

at a greater level of detail will indicate that there are
some women in Indiana for whom the "presence" rule is
not a problem, just as there were many women in Penn-
sylvania who did not anticipate any problem with spou-
sal notification. Surely the majority does not think that
every woman in Indiana lives close to a clinic; like
all states, Indiana has significant rural areas and sig-
nificant numbers of people living far from a reproduc-
tive health services facility. (There are 11 abortion clin-
ics in Indiana, see Indiana Family Institute, Fact Sheet:
Abortion in Indiana, at http://www.hoosierfamily.org/
FactSheet13.html, covering a territory of some 36,000
square miles, see U.S. Census Bureau, State and Coun-
ty QuickFacts, at http://quickfacts.census.gov/qfd/states/
18000.html. That adds up to one abortion clinic on the
average for almost every 3,300 square miles. And, need-
less to say, it is quite unlikely that these clinics are distrib-
uted with perfect geographical regularity; to the extent
the clinics are concentrated around major cities like
Indianapolis, that means that other women in rural Indi-
ana will live substantial distances away from the nearest
facility.) At most, the details the majority demands might
suggest that more Indiana women can withstand the
burdens of the Indiana statute than their counterparts
in Mississippi could. But the question is not, for example,
whether Indiana women as a group live closer to abortion
clinics. It is whether an Indiana woman living 60 miles
away from a clinic in Indiana who cannot afford (either
financially, socially, or psychologically) to make two vis-
its, will respond the same way a Mississippi woman living
60 miles away from a clinic in Mississippi with similar
constraints did. To repeat, *Casey* made it clear that the
set of women we must consider are those who are bur-
dened by the law, and it found 1% enough to justify strik-
ing down the spousal notification rule. Maybe 10% of the
women in Mississippi have that problem and "only" 3%
of women in Indiana do. No matter. The district court

was quite reasonable to find that women in Indiana are like all other people and that their responses will be the same as those of women elsewhere.

Or it could be that the majority thinks that women in Indiana are more likely to be persuaded by the "presence" requirement than are women in Mississippi, so that the decrease in abortions due to the requirement could be attributed to the constitutionally permissible persuasive force of the law. Again, however, all the previous criticisms apply: the question is not whether more women in Indiana are persuaded than are women in Mississippi (bearing in mind that there was no evidence before the district court indicating why that should be the case). It is instead whether a sufficient number of Indiana women (something akin to the 1% of *Casey*) are *not* so persuaded, and yet are among those who will be forced to forego their right to choose.

The majority rejects wholesale the relevance of the Mississippi studies (and several other studies) by implying that the district court clearly erred in its decision that Indiana women would react to burdensome two-visit requirements in the same way, and for the same reasons, as Mississippi women did. But even in this context, it offers no reason at all to believe that Indiana women are so idiosyncratic, nor in my view could it. The Supreme Court has consistently endorsed the use of studies from other states or areas—shared experience is exactly how the "laboratories" in the several states ought to work. See, *e.g.*, *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986) (in the First Amendment context, no requirement that "a city, before enacting such an ordinance, [ ] conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.").

### III

Turning now to the evidence demonstrating that the Indiana "presence" rule indeed constitutes an undue burden, we find detailed and meticulous findings from the district court to support that proposition. This evidence was entirely competent to support the district court's decision; *Casey*'s discussion of the spousal notification rule makes it clear that evidence on undue burden does not have to meet some heightened standard of perfection. To the contrary, the Court there relied on "limited research that has been conducted with respect to [the issue at hand, there notifying one's husband about an abortion], although involving samples too small to be representative," 505 U.S. at 892, to support its conclusion about spousal notification.

We have more than zero, and less than perfection, when it comes to information about the burden the Indiana statute places on the women affected by the two-visit rule. The majority, in effect, has not only demanded perfection; it also wants a showing that some number of Indiana women significantly larger than the number the Court accepted in *Casey* are unduly burdened by the law. Every time the plaintiffs come back with more studies and more information (as they have surely done here, in comparison with the record they created in *Karlin)*, the majority raises the bar higher and tells them to come back another day—even though this court has specifically held that "the biases of one study in one case may be avoided or reversed in the next." *Mister v. Illinois Cent. Gulf R.R. Co.*, 832 F.2d 1427, 1437, n.3 (7th Cir. 1987) (Easterbrook, J.).

In this case, we have evidence, and importantly we have significant new evidence that has been developed since *Karlin,* which answers precisely the kinds of questions that *Karlin* directed future plaintiffs to address.

The district court relied on this evidence to conclude that the "in the presence" part of the Indiana law would indeed impose an undue burden on enough Indiana women seeking abortions that this part of the statute had to be enjoined. The Supreme Court has consistently endorsed the use of the type of evidence that was presented here, and has analyzed it in the "factual context of each case in light of all the evidence presented by both the plaintiff and the defendant." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). Key among this evidence before the court was a new (post-*Karlin*) study published in the Journal of the American Medical Association (JAMA), one of the most highly respected journals in the medical field, and one that meets any conceivable standard for peer-review. *Cf. Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Robinson v. California*, 370 U.S. 660, 667 n.9 (1962) (relying on findings in JAMA); *Budd v. California*, 385 U.S. 909, 912 n.3 (1966) (Fortas, J., dissenting from denial of certiorari) (same).

The JAMA study is a time-series and regression analysis designed to assess the effect of the Mississippi law on the abortion and birth rates of Mississippi residents in two ways: first, through a retrospective analysis of those rates before and after the passage of the statute, and second, through a comparison between Mississippi and two similar states, Georgia and South Carolina, neither of which had a "presence" requirement in effect at the relevant time but were otherwise similar in the relevant respects. Regression analyses are an important tool in much of social science research, as well as in law. See *McCleskey v. Kemp*, 481 U.S. 279, 293-94 (1987) (discussing their role in Title VII of the Civil Rights Act of 1964 cases and in sentencing context); see also *Bazemore v. Friday*, 478 U.S. at 398-401 (additional regression analyses conducted in response to criticisms and suggestions by the district court, all of which confirmed, and some of which

even strengthened, the study's original conclusions; further concluding that multiple-regression analysis need not include every conceivable variable to establish a party's case; and chiding the court of appeals because it "failed utterly to examine the regression analyses in light of all the evidence in the record"); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 n.13 (1977) (discussing jury selection context).[3]

The difficulty here is that there is no single independent variable that will show "undue burden." The only way to prove that a particular part of a law is imposing an undue burden on abortion choice is to hypothesize that it *might* constitute an undue burden, and then to show that no other reasonably related variable satisfactorily explains the drop in abortion rates (*i.e.*, the phenomenon that is being tested)—essentially a process of elimination. This is a methodology we have approved before. See *In re Oil Spill by Amoco Cadiz*, 954 F.2d 1279 (7th Cir. 1992) (per curiam). In that case, this court endorsed the use of simple linear regressions as a way to draw out all other plausible explanations leaving only the hypothesized one as a reason for what part of a loss in business was attribut-

---

[3] It is worth reviewing for a moment what this kind of study does. A regression takes a dependent variable (here, the decrease in abortions or abortion rates) and tests it against a number of independent variables. The independent variables are chosen before the regression is run; here, for example, they included factors like the opening of new clinics, changes in marriage rates, changes in the percentage of the population living in metropolitan areas, the increased availability of contraceptives, and changes in per capita income. Once the data is collected, the researcher runs a regression on each variable, which shows the effect of that variable, in isolation, on the dependent variable. If a variable is found to have no meaningful correlation to the dependent variable, it is discarded.

able to a massive oil spill. *Id.* at 1320. We expressed satisfaction there with this way of getting "a better grip on the relation between dependent and independent variables" and reaching "an inference of causation, and of the size of the effect." *Id.* Indeed, the latest pronouncement by the Supreme Court in First Amendment matters endorses a study by the city of Los Angeles aimed at demonstrating the connection between its ban on multiple-use adult establishments and its interest in reducing crime—a connection that can only be shown by ruling out some (but clearly not all) of the other potential independent variables that could have contributed to the effect on crime. See *City of Los Angeles v. Alameda Books, Inc.*, *supra*, ___ U.S. ___, 122 S. Ct. 1728 (plurality opinion). Dealing with the nature of such studies, the plurality concluded that a party "does not bear the burden of providing evidence that rules out every [other] theory." *Id.* at 1735. The study, however imperfect, was respected for its probative value precisely because of the lack of evidence presented by the other side to rebut its finding. As in this case, once the point was made, the opponent had to produce concrete evidence on the other side; it was not enough merely to point out an alleged imperfection in the study. *Id.* (respondents did "not offer a competing theory, let alone data" to counter the city's assertions).

That is exactly what the JAMA study did. It was tailored to explore the question (unanswered in the record in *Karlin*) whether the decrease in abortions in Mississippi was an effect not of the persuasive power of the law, but rather of its burdensome qualities. And it showed that the latter explanation was the correct one. The principal outcome measures in the study were birth rates, abortion rates, the percentage of late abortions, and the percentage of abortions performed outside the state. The researchers found that the resident abortion rates declined 12% more in Mississippi than they did in South

Carolina after the passage of the law, and they declined 14% more in Mississippi than they did in Georgia. Limited to Caucasian adults, abortions declined 22% more in Mississippi than in South Carolina and 20% more in Mississippi than in Georgia. Abortions performed after the 12-weeks gestation mark increased 39% more in Mississippi than in either South Carolina or Georgia. The percentage of abortions performed out-of-state increased 42% more among women in Mississippi relative to women in South Carolina.

The JAMA study also showed that in the 12-month period after the law took effect, the total rate of abortions for Mississippi residents decreased by approximately 16%; the proportion of Mississippi residents traveling to other states for an abortion increased by about 37%; and the number of second trimester abortions increased by some 40%. The study concluded that these statistics "suggest that Mississippi's mandatory delay statute was responsible for a decline in abortion rates and an increase in abortions performed later in pregnancy." The researchers who conducted the study testified before the district court that the only salient difference among Mississippi, Georgia, and South Carolina for these purposes was that only Mississippi had a two-trip requirement. Otherwise, the laws regulating abortions in the three states were functionally the same—and no other statistically significant events had taken place in the various states.

The district court realized that it needed to address one final, but critical, question of fact: were declines observed in abortions in Mississippi because women in Mississippi had been persuaded to forego abortions, or were the declines because the new law was impermissibly burdening the right to seek an abortion—precisely the inquiry mandated by *Karlin*. The court found that the latter explanation was the correct one, for several reasons,

all amply based on the evidence in the record. First, the "persuasive power" hypothesis was severely undercut by the evidence showing that Mississippi women were leaving the state to have their abortions elsewhere and having more second-trimester abortions. Those women quite evidently had not been persuaded to carry their pregnancy to term; they aborted their pregnancies, but they did it outside the state of Mississippi or at a later and riskier time. (And certainly we must assume that the Mississippi legislature was trying to persuade women to forego abortion, rather than to persuade them to travel out-of-state for the procedure or to postpone it to a riskier time.) Second, the court looked at evidence from Indiana itself that showed no changes in abortion rates from the information standing alone (a part of the statute that the court permitted to take effect, stripped only of the "presence" requirement). The court discussed other evidence as well, and I commend its thorough analysis, particularly its evaluation of similar studies conducted in Utah and Louisiana. In the end, its conclusion was that the "sum of this evidence, and the absence of evidence of any persuasive effect, shows convincingly that the predicted reduction in abortion rates would result not from persuasion but from restrictions posing a substantial obstacle for some women's ability to obtain abortions." As mentioned before, even if the relative numbers of women who were persuaded versus burdened are different in Mississippi and Indiana, the study conclusively reveals that a significant number of Indiana women will be unduly burdened by the "presence" requirement. And those women—not those who are persuaded, or unaffected, or not even contemplating an abortion—are those on whom the majority should have concentrated under *Casey* and *Stenberg*.

Whether this court is looking at the record *de novo*, under an abuse of discretion standard, or merely for clear error, the district court's findings should stand. I find nothing

in the majority's speculation that comes close to refuting the evidence upon which the court relied. See *City of Los Angeles*, 122 S.Ct. at 1735 (disapproving of fact that the "Court of Appeals simply replaced the city's theory . . . with its own" and that its analysis "implicitly requires the city to prove that its theory is the only one that can plausibly explain the data"). Only by disregarding key points such as the number of women who willingly undertook the burden of seeking an abortion out-of-state, where they could have the entire procedure accomplished in one visit, rather than staying in-state and enduring the two-visit burden, can the majority come to the result it does.

## IV

Finally, although not necessary to my analysis, it is worth noting that *Casey* said that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the *purpose or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877 (emphasis added). The majority considers only the "effect" part of that disjunctive test, perhaps thinking that this court's dismissal of the "purpose" half in *Karlin* was binding on the Supreme Court. I am under no such illusion. I believe, therefore, that it is appropriate to take a brief look at the purpose Indiana offered for this regulation, to see if it might either help to save the statute or to condemn it.

The district court found that "[t]here is no evidence tending to show how the 'in the presence' requirement actually furthers the state's legitimate interests in maternal health or in protecting potential life." It said this, importantly, after the plaintiffs had made an extensive *prima facie* showing that the statute furthered neither legitimate interest; in the sense of a burden of production, the court was concerned that Indiana had offered

nothing to the contrary. (Indiana argues strenuously that the district court imposed an impermissible shift in the ultimate burden of proof, but it is clear from the court's opinion as a whole that it did no such thing; it was simply addressing the evidentiary vacuum on Indiana's side in the face of the plaintiffs' evidence.)

Indeed, my search of the legislative history of the Indiana statute reveals no reason whatsoever for imposing a two-visit requirement for the dissemination of the required information. Acting as if it were conducting rational basis review, the majority speculates that some Indiana legislator might have thought that absorption of information occurs more effectively when it is transmitted in person. Maybe so, but that does not explain why the state could not simply have said that at the point of checking into the clinic, the previously transmitted information must be reiterated in person. The change from an oral communication to an "in the presence" requirement was added by a floor amendment in the House of Representatives that was marked by scant debate. After some members of the House suggested that the "in the presence" requirement was intended as an obstacle to abortion, its chief sponsor stated instead that the concern was that unless the information was given in person, "how do you know this is the doctor or the person you're supposed to be talking to. . . . I would think you would want to talk personally to the person who may be performing that and know . . . that they are the person indeed that they [say they] are." A special concern with impostor doctors, or generally with practitioners not being who they say they are over the telephone is not a problem that is specific to abortion—or at least there were no such findings other than a statement that this possibility (of talking to an impostor) "is very dangerous, especially when you're talking about the symptoms and consequences of an abortion." Literally the only other

scrap of evidence from the legislature seems to reflect a fear that women would receive the information while they were under sedation on an operating table. But that cannot be what the legislature really feared, for the simple reason that this concern is already addressed in Indiana's law of "informed consent," which cannot be given by persons already under anaesthesia. See, *e.g.*, *Culbertson v. Mernitz*, 602 N.E.2d 98, 103 (Ind. 1992) (endorsing the American Medical Association's 1992 Code of Medical Ethics with respect to necessary consent, and rejecting as invalid consent given "where the patient is unconscious or otherwise incapable of consenting"). I would be surprised if many Indiana doctors were in the habit of obtaining consent for medical procedures from unconscious or drugged patients; they would risk loss of their medical license if they did, whether they were performing an appendectomy, knee surgery, a vasectomy, a prostate removal, or an abortion. The law of informed consent is consistent across the spectrum of surgeries and procedures: if no reason is given why heightened consent is needed in the abortion context, then this cannot be accepted as the reason for the "in the presence" requirement.

## V

For all these reasons, I believe that the majority has seriously mis-applied the *Casey* test. It has substituted its own factual assumptions for evidence that is in the record; it has failed to focus on the women for whom that statute will create problems; and it seems to think that the *Casey* Court was not serious when it emphasized the lack of evidence in the record before it, by implying that the result in *Casey* dictates the result here. I respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*